STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. DAVE FASS, DEFENDANT-APPELLANT.

Argued September 13, 1961—Decided November 6, 1961.

*Mr. Robert S. Miller,* Deputy Attorney General, argued the cause for plaintiff-respondent (*Mr. David D. Furman,* Attorney General of New Jersey, attorney).

*Mr. Joseph L. Freiman* argued the cause for defendant-appellant.

The opinion of the court was delivered by

FRANCIS, J. Defendant Dave Fass operates a store in West New York, New Jersey, for the retail sale of floor coverings. He was charged in the Municipal Court with making a sale of merchandise there on Sunday in violation of *L.* 1959, *Chapter* 119, §§ 1 and 3, *N. J. S.* 2A:171–5.8

and 5.10. He admitted the sale but defended on the ground that the statute is invalid because it interferes with the free exercise of his religion in violation of the First Amendment of the *United States Constitution* (which is applicable to the states by virtue of the Fourteenth Amendment of that Constitution), and of *Article* I, *paragraphs* 4 and 5, of the *New Jersey Constitution.* In addition, he claimed to be immune from prosecution under *N. J. S.* 2A:171-4 as a Sabbatarian. He was convicted in the Municipal Court and the judgment was affirmed on a trial *de novo* in the County Court. His subsequent appeal was certified by this court before argument in the Superior Court, Appellate Division. After the matter was presented to us the United States Supreme Court on June 19, 1961 decided a series of cases involving attacks upon the constitutionality of the Sunday closing laws of Maryland, Massachusetts and Pennsylvania. All of the various claims of invalidity were rejected, including the contentions that such statutes violated the equal protection clause of the Fourteenth Amendment and the religious freedom guaranty of the First Amendment of the Federal *Constitution.* See *McGowan v. State of Maryland,* 366 *U. S.* 420, 81 *S. Ct.* 1153, 1218, 6 *L. Ed.* 2d 393; *Gallagher v. Crown Kosher Super Market,* 366 *U. S.* 617, 81 *S. Ct.* 1122, 6 *L. Ed.* 2d 536; *Two Guys from Harrison-Allentown, Inc. v. McGinley,* 366 *U. S.* 582, 81 *S. Ct.* 1135, 6 *L. Ed.* 2d 551; *Braunfeld v. Brown,* 366 *U. S.* 599, 81 *S. Ct.* 1144, 6 *L. Ed.* 2d 563. In the light of those determinations, we called for additional briefs and reargument.

Section 1 of Chapter 119, *L.* 1959, provides:

"On the first day of the week, commonly known and designated as Sunday, it shall be unlawful for any person whether it be at retail, wholesale or by auction, *to sell, attempt to sell or offer to sell or to engage in the business of selling,* as hereinafter defined, clothing or wearing apparel, building and lumber supply materials, furniture, home or business or office furnishings, household, business or office appliances, except as works of necessity or charity or *as isolated transactions not in the usual course of the business of the participants."* (Emphasis added)

*Section* 3 says that "sell" means

"* * * to enter into an agreement whereby the seller transfers ownership or property in the goods or an interest in the goods to the purchaser for a consideration, * * *."

"Offer to sell" means

"* * * the acceptance of bids or proposals for the purchase of goods at a future date or the attempt to induce a sale as hereinabove defined, or the attempt to induce an immediate transfer of any such merchandise, *but not to include advertising or display of any such merchandise which merchandise is not available for purchase on Sunday*." (Emphasis added)

"Engage in selling" means

"* * * the attempt to sell or to induce an immediate or future transfer of any such merchandise by describing, explaining, extolling or identifying any such merchandise while the seller is in personal contact with the potential purchaser."

The constitutionality of the statute was sustained by a majority of this court in *Two Guys from Harrison v. Furman,* 32 *N. J.* 199 (1960), against charges that it imposed discrimination upon and denied equal protection of the law to persons who were engaged in the business of selling articles in the five forbidden categories. Also rejected was the contention that the legislation transgressed the prohibition of the Federal and State Constitutions against the enactment of laws "respecting an establishment of religion" or "of one religious sect in preference to another." First Amendment, *United States Constitution; Article* I, *par.* 4, *New Jersey Constitution.* That decision must be regarded as having established the present law of this State. Reserved by the opinion, however, was the question whether the ban on Sunday sales in the listed classes of commodities impinged "upon the freedom of those who observe religiously the seventh day of the week." The issue was not presented and no view was expressed on it. 32 *N. J.,* at *pp.* 216, 217. This case brings it to us for the first time.

Fass is a votary of the Orthodox Jewish faith. The tenets of his religion require him to keep, and he does keep, the seventh day of the week as his Sabbath. On that day he abstains from his usual business or occupation and devotes himself exclusively to religious worship. His Sabbath begins at sundown on Friday (at which time he closes his store) and ends at sunset on Saturday. Thus, his store is closed two days each week: on Saturday, because of the spiritual proscriptions of his religious orthodoxy, and on Sunday, through compulsion of secular law, *L.* 1959, *Chapter* 119, while his business competitors of other faiths, or of no faith at all, are prohibited from engaging in traffic in the five classes of goods only on one day of the week, *i. e.,* Sunday. The resulting additional economic loss imposed on him by the statute makes the practice of his religion more burdensome and therefore, he claims, constitutes an unconstitutional hindrance to its free exercise.

The precise question was considered in *Braunfeld v. Brown* and *McGowan v. State of Maryland, supra,* and disposed of adversely to the defendant by a majority of the members of the United States Supreme Court. In *Braunfeld,* Chief Justice Warren declared that the Pennsylvania Sunday closing Law (18 *P. S.* § 4699.10) was simply a regulation of secular and not of religious activity, designed by the legislative branch of the government to secure in each week a common day of rest, relaxation and recreation for all persons. 366 *U. S.,* at *p.* 604, 81 *S. Ct.,* at *p.* 1147, 6 *L. Ed. 2d,* at *p.* 567. In answer to the argument that the basic purpose would be served by selection of some day other than Sunday or by permitting each person to decide upon his own day of abstinence from work, both the Chief Justice, and Justice Frankfurter in his exhaustive concurring opinion, said a state might reasonably conclude that the suggested alternatives would not provide for the desired general cessation of activity or the sought for atmosphere of rest and tranquility; that they would provide only periodic physical rest, not the atmosphere of entire community repose which Sunday has

traditionally brought. *McGowan v. State of Maryland, supra,* 366 *U. S.,* at *pp.* 449, 505, 506, 81 *S. Ct.,* at *pp.* 1117, 1178, 1179, 6 *L. Ed. 2d,* at *pp.* 413, 414, 444, 445; see also *Two Guys from Harrison v. Furman, supra,* 32 *N. J.,* at *pp.* 215, 216.

In *McGowan* and *Braunfeld* it was further contended that in view of the indirect economic burden cast on Sabbatarians, conformity with the guaranty of freedom of religion as to them could be achieved only by legislative grant of an exemption from the restrictions of Sunday closing statutes. Here again, the court ruled adversely, holding that such a qualification was a matter of legislative judgment and not necessary to constitutional regularity. In *Braunfeld v. Brown* Chief Justice Warren said:

"However, appellants advance yet another means at the State's disposal which they would find unobjectionable. They contend that the State should cut an exception from the Sunday labor proscription for those people who, because of religious conviction, observe a day of rest other than Sunday. By such regulation, appellants contend, the economic disadvantages imposed by the present system would be removed and the State's interest in having all people rest one day would be satisfied.

A number of States provide such an exemption, and this may well be the wiser solution to the problem. But our concern is not with the wisdom of legislation but with its constitutional limitation. Thus, reason and experience teach that to permit the exemption might well undermine the State's goal of providing a day that, as best possible, eliminates the atmosphere of commercial noise and activity." 366 *U. S.,* at *p.* 608, 81 *S. Ct,.* at *p.* 1148, 6 *L. Ed. 2d,* at *p.* 569.

Justice Frankfurter reached the same conclusion on this problem. He said:

"In urging that an exception in favor of those who observe some other day as sacred would not defeat the ends of Sunday legislation, and therefore that failure to provide such an exception is an unnecessary—hence an unconstitutional—burden on Sabbatarians, the *Gallagher* appellees and *Braunfeld* appellants point to such exceptions in twenty-one of the thirty-four jurisdictions which have statutes banning labor or employment or the selling of goods on Sunday. Actually, in less than half of these twenty-one States does the exemption extend to sales activity as well as to labor. There are

tenable reasons why a legislature might choose not to make such an exception. To whatever extent persons who come within the exception are present in a community, their activity would disturb the atmosphere of general repose and reintroduce into Sunday the business tempos of the week. Administration would be more difficult, with violations less evident and, in effect, two or more days to police instead of one. If it is assumed that the retail demand for consumer items is approximately equivalent on Saturday and on Sunday, the Sabbatarian, in proportion as he is less numerous, and hence the competition less severe, might incur through the exception a competitive advantage over the non-Sabbatarian, who would then be in a position, presumably, to complain of discrimination against *his* religion. Employers who wished to avail themselves of the exception would have to employ only their co-religionists, and there might be introduced into private employment practices an element of religious differentiation which a legislature could regard as undesirable. [366 *U. S.*, at *p.* 514, 81 *S. Ct.*, at *p.* 1183, 6 *L. Ed.* 2d, at *pp.* 449, 450]

\* \* \* \* \* \* \* \*

In view of the importance of the community interests which must be weighed in the balance, is the disadvantage wrought by the non-exempting Sunday statutes an impermissible imposition upon the Sabbatarian's religious freedom? Every court which has considered the question during a century and a half has concluded that it is not. This Court so concluded in *Friedman v. New York*, 341 *U. S.* 907, 95 *L. Ed.* 1345, 71 *S. Ct.* 623. On the basis of the criteria for determining constitutionality, as opposed to what one might desire as a matter of legislative policy, a contrary conclusion cannot be reached." 366 *U. S.*, at *p.* 522, 81 *S. Ct.*, at *p.* 1187, 6 *L. Ed.* 2d, at *pp.* 453, 454.

■ Reference is made to these portions of the Federal cases to demonstrate that a Sunday closing law otherwise valid is not invalidated because it does not contain any exemption for persons whose religious beliefs require them to observe Saturday or some other day of the week as their Sabbath. For example, Moslems choose Friday; Buddhists, a day which is determined by the phases of the moon and may vary from week to week. "Sunday Legislation," 73 *Harv. L. Rev.* 729, 734, *n.* 55 (1960). The New Jersey Sunday Closing Act, *N. J. S.* 2A:171–4, however, does contain an excepting clause for Sabbatarians, which is claimed to be applicable in the present controversy. Its limited operative effect, however (to be discussed hereafter), makes

relevant the expressed view that no such clause is necessary to satisfy the constitutional requirements for religious freedom.

The effect of the four Federal cases to which we have referred and the concordant majority decision of this court in *Two Guys from Harrison v. Furman, supra,* is to establish that *L.* 1959, *Chapter* 119, does not deprive retail merchants of equal protection of law. The present writer, who dissented in *Two Guys,* bows to those judgments. My associates of the majority in this case originally held the view that prevailed. The Federal cases demonstrate also that the designation therein of Sunday as the common day of rest and recreation, does not infringe invidiously upon organic safeguards for the free exercise of religious beliefs, and that it does not constitute the act as one "respecting an establishment of religion" or as establishing or tending to establish "one religious sect in preference to another." Selection of one fixed day in seven in aid of community need and desire for respite from ordinary business activity is a matter of legislative policy, judgment and discretion. So long as the choice does not transgress constitutional limitations, the wisdom of the action is solely within the ambit of the legislative branch of the government.

Thus we are brought to consideration of the final facet of Fass' defense. He argues that because of the exception granted to him as a Sabbatarian under 2*A*:171–4, the sale of carpeting cannot be considered a violation of *L.* 1959, *Chapter* 119.

*Section* 4, which is said to grant the immunity, first appeared in the general Sunday Closing Act of 1798, *Paterson's Laws, p.* 329. The language of the section was substantially the same then as it is now. It provides:

"If any person charged with having labored or worked on Sunday shall prove to the satisfaction of the court that he uniformly keeps the seventh day of the week as the Sabbath, habitually abstains on that day from following his usual occupation or business and from all recreation, and devotes the day to the exercise of religious worship,

and if the work or labor for which such person is *informed against* was done and performed in his dwelling house or workshop, or on his premises, and has not disturbed other persons in the observance of the first day of the week as the Sabbath, then the defendant shall be discharged. This section shall not be construed to allow any such person *to openly expose to sale* on Sunday any goods, wares, merchandise or other article or thing *in* the line of his business or occupation." (Emphasis added)

Defendant's right of exoneration, therefore, depends upon the nature of this exception, and, more specifically, whether he "openly" exposed "to sale" goods "in the line of his business or occupation."

Before turning to a study of the statute, the nature of defendant's business and its operation on Sunday should be set forth.

Fass and his brother-in-law operate a store for the retail sale of floor coverings (carpeting, linoleum, etc.) at the corner of Bergenline Avenue and 61st Street, West New York, New Jersey. Floor coverings are specifically included as "home furnishings" within the Sunday sale ban. 2A:171–5.10. The store has a full glass front and side on the two streets, the glass, about 11 feet high, extending from the sidewalk to the ceiling level. There are double entrance doors, also of glass. The full interior of the store can be seen from the public sidewalk. The ordinary person approaching the place would realize that the business being conducted there was the sale of floor covering. As Fass described the scene, it is not necessary to put or keep goods in or at the window because "you can see the whole store through the window."

Fass closes the establishment a half hour before sunset on Friday and opens again for business about 20 minutes after sunset on Saturday. In order to communicate the fact of his Sabbath closing to the public, a sign is placed in the window saying that the store is closed on Saturday and will reopen after sunset. Additionally, advertisements to that effect are placed in a newspaper. That practice has been followed since the inception of the business in 1946.

Since 1956, however, the store has been open to the public for business on Sunday. Of course, the Sabbath closing sign is out of the window on Sunday and the sales operations on that day are precisely the same as on week days. The situation existing on the Sunday of the sale which resulted in these proceedings is illustrative of normal operation. According to the officer who made the arrest, the physical condition of the store was as described above. The entrance door was open for admission of the public; the lights were on and four or five salesmen in addition to Fass were on duty when the sale of carpeting was made.

The record indicates that since the arrest Fass works in the store on Sunday, apparently preparing for Monday operation; but the premises are not open to the public for business. The work or labor Fass now engages in on Sunday is no longer the subject of any prohibition; nor would there be any ban on public Sunday sale of goods or commodities other than those enumerated in *L.* 1959, *Chapter* 119. *Two Guys from Harrison v. Furman, supra,* at *p.* 225.

On the facts outlined, the crucial question is: Did Fass "openly expose to sale on Sunday any goods, wares, merchandise or other article or thing in the line of his business or occupation"? If so, he cannot claim the benefit of the exemption. A broader question is inherent in the statutory language: regardless of the construction of "openly expose to sale," is not an *actual sale* of a commodity in the line of his business proscribed whether or not accompanied by open exposure of the commodity? That actual sale is not permitted under the *section* 4 exception has been assumed by some persons who have written on the subject. See concurring opinion of Justice Frankfurter in *McGowan v. State of Maryland, supra,* 366 *U. S.,* at *p.* 515, 81 *S. Ct.,* at *p.* 1183, 6 *L. Ed. 2d,* at *p.* 449 & *n.* 103; "Sunday Legislation," 73 *Harv. L. Rev., supra,* at *p.* 733 & *n.* 47; 743 & *n.* 91. We pass that problem, however, to deal with the issue in the fashion in which defendant presents it here. In doing so,

we shall assume broadly that work or labor as used in *section* 4 comprehends sales of goods. See *Harris, Treatise on Sunday Laws* (1892), at *p.* 92.

Defendant contends that "openly expose to sale" in the light of the antiquity of the Sunday Closing Law of 1798 (the substance of which, excluding *section* 4, was declared repealed by implication in *Two Guys from Harrison*) has a limited significance. He claims that immunity from prosecution is granted to all Sabbatarians, who observe Saturday religiously as described in section 4, and who do not sell their goods by hawking or crying them in the public streets or by maintaining open stands on the public streets or sidewalks, or, more generally, who do not conduct their business of selling in such manner as to interfere with or disturb the peace and tranquility of those seeking rest, recreation and diversion on Sunday. We cannot agree.

Our first comprehensive Sunday closing legislation appeared in 1798. It forbade "travelling, worldly employment or business, ordinary or servile labor or work, * * * (works of necessity and charity excepted)" and ordained that "no person shall cry, shew forth, or expose to sale, any wares, merchandises, fruit, herbs, meat, fish, goods or chattels, upon the first day of the week, commonly called Sunday, or sell or barter the same * * *." *Paterson's Laws,* 1798, *p.* 329, § 1. *Section* 4, containing the exception for Sabbatarians, appeared substantially in the form quoted above.

This act, like most of those adopted in this country, traces back to 29 *Charles* II, *chapter* 7, in 1677, which provided that "* * * no tradesman, artificer, workman, labourer or other person whatsoever, shall do or exercise any worldly labor, business or work of their ordinary callings, upon the Lord's Day, or any part thereof (works of necessity and charity only excepted) * * * and that no person or persons whatsoever, shall publickly cry, shew forth, or expose to sale any wares, merchandizes, fruit, herbs, goods or chattels whatsoever, upon the Lord's Day or any part thereof * * *."

It will be observed that labor, business or work, or the public crying, showing forth or exposing to sale of goods in the *ordinary calling* was proscribed. In England this language was held to relate only to transactions or sales made in the course of a person's regular business, *i. e.*, those things which the ordinary duties of the trade or business bring into continued action. *Drury v. Defontaine,* 1 *Taunt.* 131, 127 *E. R.* 781 (*C. P.* 1808); *Rex v. Whitnash,* 7 *Barn. & C.* 595, 108 *E. R.* 845 (1827); *Scarfe v. Morgan,* 4 *M. & W.* 270, 150 *E. R.* 1430 (1838); 1 *N. J. L. J.* 311, 312, 313; *Harris, op. cit. supra,* at *pp.* 36–40; *Story on Sales* (1862) 638. In this country, and particularly in New Jersey, many legislatures undertook to avoid that limitation on the observance of Sunday as a day of rest and relaxation. 1 *N. J. L. J., supra,* at *p.* 313. The purpose was accomplished here by exscinding the reference to "ordinary callings," and enacting that "no travelling, worldly employment or business shall be done on Sunday." Speaking of the earlier construction, Chief Justice Beasley in *Reeves v. Butcher,* 31 *N. J. L.* 224, 226 (*Sup. Ct.* 1865), and criticizing an earlier opinion of the court in *Crocket v. Vanderveer,* 3 *N. J. L.* 422, 424 (*Sup. Ct.* 1811), said:

"A regulation thus mutilated does not appear to have recommended itself to the framers of our statute, and hence the inhibition of all 'worldly employment or business.' The terms are comprehensive, and the legislative intent manifest. In my opinion, the effect of the provision is to annul every transaction which, if performed on a week day, would be enforceable in a court of justice. Bating the cases taken out of the general rule by the act itself, there can be no such thing as a suable contract made in this state on a Sunday."

The effect of the more comprehensive exclusion in our act of 1798 was to condemn all sales on Sunday whether public or private, irrespective of whether they were in the ordinary calling of the seller. Oddly enough, the broader language was not carried into the *section* 4 exemption for Sabbatarians. There, as has been noted, the immunity from prosecution does not apply where there is an open exposure to

sale of goods or merchandise "in the line of his business or occupation." In this context, however, the quoted words are simply words of identification; they mean that there shall be no open exposure to sale of the goods the Sabbatarian is in the business of selling.

We have been unable to locate any decision of the English courts construing the language in 29 *Charles II, chapter 7*, that "no person shall publickly cry, shew forth or expose to sale" any merchandise. It does seem obvious that the mere public or open exposure of the goods "to sale," completed the offense. Actual sale was not necessary. This is indicated by the last part of the clause saying that the offender "shall forfeit the same goods so cried, or shewed forth, or exposed to sale." In any event, it seems reasonable to conclude that the basic intention of the statute was to prevent on Sunday such conduct or action on the part of a person, whose ordinary calling or business was the selling of certain goods, as would indicate plainly to the public that he was open for business and his goods were available for sale.

Light may be gained, however, on the meaning of the clause under study by reference to the history of enforcement of 29 *Charles II, chapter 7*. On three occasions between May 30, 1660 and August 1663, Charles II had issued a proclamation against "vicious debauched and profane persons," urging the magistrates to enforce the laws against all such persons. Neither these proclamations nor the 1677 Sunday Act, nor other existing penal laws evoked a satisfactory response. Beginning with 1690, various voluntary societies of citizens came into being to awaken the "sleeping vigor" of the laws against vice and immorality and "by prudent and Christian methods to forward the due execution of them." It was part of their operation to give information to the magistrates on violations of such laws, and they made solemn agreements among themselves and with public officials as to the manner of performing their functions. Written instructions were given to the informers as to circumstances which were to be regarded as sufficient to war-

rant an information. *Radzinowicz, A History of English Criminal Law* (1957), *Vol. 2, pp.* 4–8; *Vol. 3, Chap.* 7, *passim.* With regard to the enforcement of the section of the Sunday law with which we are concerned, the instructions given in 1693 as to the proof justifying action, were:

"As to ye Crime of exposing goods to Sale on the Lords day if it be by those that live in Cellars unless the goods are exposed wthout the doores of the Cellar they are advised not to inform agt them tho they be all round the Staires because such persons have a just excuse for keeping open their Cellar door for ye benefitt of the light but if they be seen selling then they may be informed agt for exercising their ordinary calling Provided ye persons yt informed agt ym be not the Buyer And if any Ware fruit &c be exposed wthout ye door of ye Cellar or in any Shop wth ye window open or on any stall wether belonging to ye person that owes such goods nor not tho there be nothing seen to be sold That is a sufficient ground of Information." *Radzinowicz, supra,* Vol. 2, Appendix 1, *pp.* 431–38, referring to "An Agreement of Divers Gentlemen and Citizens in and about London for promoting the execution of the Lawes made against profaness and debauchery" of June 8, 1693, and "An Agreement of Divers Constables and Other Officers of London" (no date, but probably slightly later. *Id. Vol.* 2, *p.* 5) to be found in *M.S. Rawl. D.* 129 ff. 1–2 and 29–31 (Bodleian Library).

Relatively few instances are to be found in the United States of judicial construction of phrases like "openly expose to sale." The early statute in New York decreed that "No person shall expose to sale any wares, merchandise, fruits, herbs, goods or chattels on Sunday." 1 *R. S., p.* 676, *sec.* 71. It was held to apply only to "the public exposure of commodities to sale in the streets, or in stores and shops, warehouses or market places." A private, casual contract or sale on Sunday was not invalidated thereby, at least if it did not violate or tend to violate the public quiet or solemnity of the day. *Boynton v. Page,* 13 *Wend.* 425 (*N. Y. Sup. Ct.* 1835); *Miller v. Roessler,* 4 *E. D. Smith* 234 (*N. Y. C. P.* 1855); *Batsford v. Every,* 44 *Barb.* 618 (*N. Y. Sup. Ct.* 1865); *Eberle v. Mehrbach,* 55 *N. Y.* 682 (*Ct. App.* 1874); *People v. Oser,* 170 *N. Y. S. 2d* 277 (*City Mag. Ct.* 1958); *Harris, op. cit. supra, p.* 131; 83 *C. J. S. Sunday* § 15.

In Minnesota the statute prohibited public selling and offering for sale publicly of property on Sunday. The Supreme Court of that State, in discussing the nature of the offense, said:

"There is no inhibition in the statute upon a private casual sale, as were those now in dispute * * *. The prohibition extends to public sales and publicly offering for sale only. The statute does not cover or affect contracts or casual sales made privately, and without violating, or tending to produce a violation of, the public order and solemnity of the day." *Ward v. Ward,* 75 *Minn.* 269, 77 *N. W.* 965 (1899).

And see *State v. Hogan,* 212 *Mo. App.* 473, 252 *S. W.* 90 (*Ct. App.* 1923) ; *State v. Campbell,* 206 *Mo.* 579, 105 *S. W.* 637 (1907).

Some enactments forbid the keeping of open shop or open store. This has been said to mean more than ·just having the door open. It means keeping the door open and the exposition of goods there for the purpose of sale to the public. An actual sale need not be proved, however, to establish the offense. *City of Gulfport v. Stratakos,* 90 *Miss.* 489, 43 *So.* 812 (*Sup. Ct.* 1907); *Jebeles v. State,* 131 *Ala.* 41, 31 *So.* 377 (*Sup. Ct.* 1902); *Commonwealth v. Dextra,* 143 *Mass.* 28, 8 *N. E.* 756 (*Sup. Jud. Ct.* 1886). Whether the doors are open or closed, though an element to be considered, is not of vital importance. It is sufficient if the merchant in some way discloses his willingness to afford admittance to those who apply for the purpose of buying or trading in his merchandise, and keeps his store in such condition that access may be had to it on the Sabbath. *Dixon v. State,* 76 *Ala.* 89 (*Sup. Ct.* 1884) ; *Snider v. State,* 59 *Ala.* 64 (*Sup. Ct.* 1877); *Commonwealth v. Lynch,* 74 *Mass.* 384 (*Sup. Jud. Ct.* 1857).

The New Jersey Legislature ordained in 1798 and continued the mandate in the 1937 and 1951 Revisions (*N. J. S.* 2A :171–4) that *section* 4 shall not be *construed* to allow a Sabbatarian to openly expose to sale any merchandise in the line of his business or occupation. We are convinced from

our study of the problem that a merchant, prior to the adoption of *L.* 1959, *Chapter* 119, who religiously observed Saturday as his Sabbath, could not claim the immunity if he opened his store or shop to the public on Sunday for the ordinary operation of the business regularly conducted therein. If his place was open for the purpose of doing business indiscriminately with the public in the goods or wares usually sold therein, there was an open exposure to sale within the statutory proviso. Clearly the conduct of defendant's business as described above would have rendered the immunity inapplicable prior to 1959.

The state of Sunday closing regulation in New Jersey since enactment of *L.* 1959, *Chapter* 119, indicates that the same view must be taken now. Apart from (1) the inferences to be drawn from both the history of Sunday closing legislation in England and in this country, (2) the plain meaning of the proviso withdrawing the immunity where the Sabbatarian openly exposes his goods to sale in the regular course of business, and (3) the emphatic language of *Chapter* 119 forbidding sale, attempt to sell, offer to sell, or engaging in the business of selling the listed items, the conclusion we have reached is expressive of the rationale of *Two Guys from Harrison.* The constitutionality of the limited Sunday restriction of *Chapter* 119 was sustained generally in that case on the theory that it probably represented an effort on the part of the Legislature to strike at the public evil associated with Sunday business activity where it was most pronounced. The court said:

"The legislative body may upon that approach classify operations upon such considerations as the amount of traffic, noise, or other bustle, and weigh those factors against, not necessity or charity, but rather relative utility and convenience to the public. * * *.

Here the broad power to classify discussed in *Holderman, supra,* (24 *N. J.,* at *pages* 300–305), comes into play. In the absence of a compelling showing to the contrary, we must assume, as the facts may reasonably be, that the Legislature found the items dealt with by chapter 119 are the ones which, above and beyond all others, *are provocative of the problem; that the elimination of their sale on*

*Sunday will remove the undue interference with the opportunity* of the citizens for relief from the stress of everyday pursuits. Upon the stated thesis, the Legislature may indeed hit the evil where it is felt most in its quest for a reasonable balance of the interests involved." 32 *N. J.*, at *pages* 228, 229. (Emphasis added)

With the *Two Guys* decision, the general closing Act, 2A:171–1, 2 and 6 to 12, vanished from the scene. The ban imposed thereby on worldly employment or business no longer exists. In its place is *L.* 1959, *Chapter* 119, which forbids only sale or offer or attempt to sell goods in the five categories specified. (The law becomes operative only in those counties which adopt it by referendum. It has been approved in only 12 counties thus far, Hudson County being one of them. Three counties have rejected it. So in nine counties Sabbatarians are free to conduct their businesses on Sunday, at least in the absence of a municipal closing law.) All other forms of business or labor (not otherwise illegitimate) may be pursued in freely on Sunday, and all persons may engage in them whether Sabbatarians or otherwise. Only those Sabbatarians in the 12 counties referred to, who sell goods in the five classes, are prevented from selling on Sunday; and even they can work about their stores on or in connection with such articles, providing they do not open their places of business to the public for the purpose of selling or offering or attempting to sell them. And if such Sabbatarians deal in articles or merchandise that are not within the prohibition, they are free to open their places of business to the public on that day. Moreover, if they are in the business of selling other goods or articles, as well as those banned from sale or offer of sale, their shops may properly be opened for regular disposition of the non-prohibited items. In this situation may well be found an illustration of the operation of the legislative order against openly exposing to sale the five excluded classes of merchandise. Such vendors of both excluded and permitted articles may have their shops open to the public for business as usual, and they will not be regarded as openly ex-

posing to sale the forbidden items appearing therein, so long as they make it clear by satisfactory means, *i. e.,* covering up or roping off or adequate signs, that the latter items are not being offered for sale or to be sold.

On the basis of our conclusion that on the admitted facts relating to the nature of the business operation on Sunday, Fass openly exposed goods barred from sale by *L.* 1959, *Chapter* 119, the judgment of conviction can be affirmed without more. But it does seem advisable to consider some further implications of the *section* 4 immunity for Sabbatarians in the framework of the 1959 act. As we have said, such persons, who are in the business of selling goods in the five excluded classes, cannot openly expose them to sale on Sunday. Since they can keep their stores open on Sunday for the sale of all other merchandise, did the adoption of *Chapter* 119 empty *section* 4 of all value? We think not.

Authorities have been alluded to above which sustained certain Sunday sales of goods. Such instances did not represent transactions occurring in a store that was open for the indiscriminate sale of merchandise to the public. They were private casual sales not associated with public exposure for sale, and not accompanied by disturbance of those seeking rest, relaxation and recreation on that day. Compare also, *Goldstein v. Vaughan,* 1 *Q. B.* 549 (1897). In our judgment such sales, appraised in the light of the 1959 act, reasonably appear to be, and we hold them to be, within the intendment of *section* 4. The immunity granted by that section therefore will protect a Sabbatarian so selling from prosecution.

The suggestion that the prohibition against open exposure to sale only bans sales in public markets maintained by or licensed or authorized as such by public authorities or in public places, is not tenable. We find no reasonable support in history, in other jurisdictions, or in the language for such a narrow construction. In the face of modern commercial life, such an interpretation would amount to no limitation of any consequence at all. A Sabbatarian could open his

business on Sunday and freely engage in indiscriminate sale of goods to the public in the five classes banned by the 1959 act. It would be permissible to advertise in the public press that he would be open for trade on Sunday, to have large "Open" signs in his front windows on Sunday, to have such signs in neon lights, with arrows pointing to the entrance doorway, and the like. And all this in a community or county where the people had voted to adopt *L.* 1959, *Chapter* 119. Such practice cannot be said to reasonably represent the legislative intention in withholding the immunity in cases of open exposure of goods to sale.

Moreover, as Justice Frankfurter pointed out in *McGowan, supra:*

"If it is assumed that the retail demand for \* \* \* [the five classes of goods banned by the New Jersey Act of 1959] is approximately equivalent on Saturday and on Sunday, the Sabbatarian, in proportion as he is less numerous, and hence the competition less severe, might incur through the exception a competitive advantage over the non-Sabbatarian, who would then be in a position, presumably, to complain of discrimination against *his* religion." 366 *U. S.*, at *p.* 516, 81 *S. Ct.*, at *p.* 1183, 6 *L. Ed.* 2d, at *p.* 450. (Emphasis Justice Frankfurter's, but bracketed substitution ours. Of course, the New Jersey Act was not involved in *McGowan.*)

Justice Frankfurter's observation is more strongly pertinent in the factual context of this case because Fass opens his store about 20 minutes after sundown on Saturday. Thus, if he has legislative permission to open on Sunday, he not only has the business advantage described in *McGowan* but the advantage is enhanced through his Saturday after sundown operation.

We know that for many centuries some people have devoutly and conscientiously believed the seventh day of the week to be the divinely ordained Sabbath. They have clung with unswerving fidelity to that belief through relentless persecutions and travail. We know, too, that such persons, who are engaged in the business of selling of articles in the five classes outlawed for public sale on Sunday in the

12 counties where *Chapter* 119 is effective, undoubtedly suffer some economic loss. Recognition of these facts has impelled legislatures of 21 of the 34 states, which have statutes banning labor or employment or the selling of goods on Sunday, to grant some mitigating exemption. But as Justice Frankfurter observed, in his concurring opinion in *McGowan,* in less than half of these 21 states was the exemption extended to sales activity as well as to labor. 366 *U. S.,* at *p.* 513, 81 *S. Ct.,* at *p.* 1182, 6 *L. Ed. 2d,* at *p.* 449. In England an exception, including a limited right to sell, has been established. It is subject to regulation with administration thereof substantially in the hands of representatives of the Sabbatarians themselves. See 17 *Halsbury's Laws of England* (*3d Ed.* 1956), *pages* 207–09; *n.* (e), *p.* 209. Under our tripartite system of government the nature and extent of any exemption within constitutional limits is a matter of policy for the Legislature. Courts have no such creative power whatever their views may be as to the desirability of some form of relief. Awareness of limitations on the judicial function evoked this comment from the New York Court of Appeals in *People v. Friedman,* 302 *N. Y.* 75, 96 *N. E. 2d* 184 (1950):

"We are bound to construe statutes as we find them and may not sit in review of the discretion of the Legislature or determine the expediency, wisdom or propriety of its action on matters within its powers * * *. A plea that a statute imposes inconvenience or hardship upon a litigant should be addressed to the Legislature; we may not usurp its functions by legislating judicially." 96 *N. E. 2d,* at *pp.* 185–86.

See also *McGowan v. State of Maryland* (concurring opinion), 366 *U. S.,* at *p.* 522, 81 *S. Ct.,* at *p.* 1187, 6 *L. Ed. 2d,* at *p.* 454; *Braunfeld v. Brown,* 366 *U. S.,* at *p.* 607, 81 *S. Ct.,* at *p.* 1148, 6 *L. Ed. 2d,* at *p.* 569.

If, perchance, we have misconstrued the language of *section* 4, or misapprehended the intention of the Legislature in retaining it, particularly in the 1937 and 1951 revisions,

having in mind the sensitive problem involved, we trust that the lawmakers will review and rephrase it so as to leave no doubt as to the nature of the exemption provided.

Under all of the circumstances, the undisputed facts in this case warranted the finding of the County Court that Fass had openly exposed his merchandise to sale on the Sunday specified, and that *section* 4 of the act does not provide him with immunity from prosecution.

The judgment is affirmed.

WEINTRAUB, C. J. (dissenting). I agree the Federal and State constitutions do not require an exemption in favor of those who observe the seventh day. The Legislature may make a policy decision for or against an exclusion. Reasons exist for a decision either way. Our Legislature struck a balance and decided in favor of members of minority faiths when it enacted the Sunday Closing Act of 1798, *Paterson's Laws, p.* 329. The provision now appears in *N. J. S.* 2A:171–4. It reads:

"If any person charged with having labored or worked on Sunday shall prove to the satisfaction of the court that he uniformly keeps the seventh day of the week as the Sabbath, habitually abstains on that day from following his usual occupation or business and from all recreation, and devotes the day to the exercise of religious worship, and if the work or labor for which such person is informed against was done and performed in his dwelling house or workshop, or on his premises, and has not disturbed other persons in the observance of the first day of the week as the Sabbath, then the defendant shall be discharged. This section shall not be construed to allow any such person to openly expose to sale on Sunday any goods, wares, merchandise or other article or thing in the line of his business or occupation."

The exemption is tightly worded to avoid spurious claims of religious devotion on the seventh day. For one who meets that exacting test, the exemption is granted, subject to the proviso that he "has not disturbed other persons in the observance of the first day of the week as the Sabbath," and to the provisions of the sentence which follows. That sen-

tence, upon the meaning of which the decision in this case depends, reads:

"This section shall not be construed to allow any such person to *openly* expose to sale on Sunday any goods, wares, merchandise or other article or thing *in the line of his business or occupation.*" (Emphasis added)

The phrase "in the line of his business or occupation" serves merely to describe the individuals affected; that is, the sentence applies only to those who are engaged in the business or occupation of selling the article involved. It is a person so engaged who may not *"openly* expose to sale" the articles he vends in his regular, gainful pursuit. The key to the present case is "openly"; and the question is whether it means (1) in public places or (2) includes also any private place to which members of the public are invited as customers.

There appears to be no statute in any state using the expression *"openly* expose to sale" and hence decisions elsewhere are not helpful. Unfortunately the official records of the 1798 statute as well as other sources of light are meager. I gather from a fairly elaborate news account (*State Gazette and New Jersey Advertiser,* February 20, 1798) that the exemption was proposed as a matter of fairness to the seventh-day observer, and that the sole pertinent objection there reported was that the exemption as a whole "would much interrupt persons who went to church, and particularly if in businesses where forges, etc., are used near a place of worship." The exemption, as adopted, guards against that type of interference in express terms, *i. e.,* "has not disturbed other persons in the observance of the first day of the week as the Sabbath." Whether that phrase and the sentence relating to exposure to sale were in the bill as originally introduced or were later added, we cannot know.

In any event, we can be satisfied that the exemption was made to avoid the obvious hardship upon the seventh-day observer who would be restrained by law from pursuing his

livelihood on one day and by his religious tenets on still another day. We know also that in 1798, as indeed today in a more limited way, wares were vended in public areas as well as upon private property. There were public market places and itinerant hawkers, the latter irritating their resident competitors then as they still do. See *Wright, Hawkers and Walkers in Early America* 84 (1927). With this backdrop, we must find what was meant by "openly" in the phrase "openly expose to sale."

It seems clear that if the Legislature intended to prohibit exposure to sale in *all* places, *i. e.*, upon private property as well as in public ways and places, it would have achieved that aim by simply barring "exposure to sale * * * in the line of his business or occupation." The word "openly" thus limits "exposure to sale * * * in the line of his business or occupation" to something less than *all* such exposures to sale. The majority opinion gives no effect to the word "openly." It is a cardinal rule that meaning must be given to all words in a statute if at all possible. Especially must that be true in this case, since the word "openly" cannot be deemed an inadvertent redundancy. The expression "openly expose to sale" is not a popular usage; it cannot be explained away as a commonplace verbal oddity. Indeed, no Sunday statute of another state uses the term. Hence we should conclude our Legislature used "openly" with deliberateness, to express an intended limitation upon "expose to sale." This is fortified by the fact that elsewhere in the same statute the Legislature used "expose to sale" without the word "openly" in a provision reading "that no person shall cry, shew forth, or expose to sale, any wares, merchandise, etc." The appearance of "openly" in the exemption to qualify "expose to sale" indicates the word was consciously used. Hence we should give effect to the word unless the sense of the situation makes it impossible or plainly absurd.

There is nothing in the context of the statute or in the external setting which compels us to find that "openly"

added nothing to the text. Sunday-closing is a touchy subject. It involves a nice adjustment among contending interests. It is plain the Legislature was concerned with the impact upon the seventh-day observer, and sought a formula which would fairly reconcile his needs with those of the Sunday observer. It concluded that all should be permitted to pursue their callings on a total of six days. It added a restraint against "disturbing" other persons "in the observance of the first day of the week as the Sabbath," an expression which connotes interference with religious exercises. It added a restraint with respect to selling, an operation capable of such interference in different degrees in different places. It struck a balance by prohibiting exposure to sale "openly," while permitting exposure to sale which falls beyond that description.

It seems to me that in the context of this statute, "openly" can have but one of two meanings. It may describe the *manner* in which the act is done, in which sense it would be the antonym of "furtive" or "concealed." This view of the word does not seem appropriate. The merchant would hardly know what he could do if penal liability depended upon the degree of privacy or secrecy he achieved in his transactions. The standard would be unworkable. It would also be something less than a meaningful exemption for one whose livelihood depends upon sales.

On the other hand, "openly" may refer to the *place* of exposure to sale, meaning "in the open," and thus differentiating the public ways and places from the private business premises. A line so drawn would make sense. We must remember the Legislature sought to relieve a member of a minority faith who because of his devotion to its demands would, but for an exemption, be injured in his livelihood. It was a matter of weighing the needs of the very limited number who could qualify for the exemption against the amount of disquiet they might generate by their selling activities. The statute itself evidences a concern for disturbance of others in their observance of Sunday as the

Sabbath. As I have said, interference of that character varies in degree with the places of activity. A decision to bar selling only from public ways and places surely cannot be said to be absurd. Indeed, I think "openly" was intended to draw precisely that line.

Even if "openly" could refer to the *manner* of selling as readily as it does to the *place* of sale, I would take the latter view. A statute which has an impact, albeit indirect, upon religious faiths should be strictly construed. When I say "strictly," I do not mean a court should obstruct the legislative purpose with private notions of its own. Rather I mean that since respect for the faiths of others is so high in our social conscience, we should assume the Legislature intended no impingement beyond the inevitable meaning of its words, and hence that if a statute is so phrased as to invite the hazard of judicial misconception, it is better to hold the statute to the minimum restraint consistent with its terms. In this delicate area a court should be certain that it is not attributing to the Legislature a burden upon minority groups which that branch of government did not intend.

Since the facts disclose that individuals other than Fass were engaged in Sunday selling at his place of business, I should note that only Fass was here charged. We do not know the religious views and habits of the others, and their amenability to the statutory prohibition is not here involved.

I would reverse the conviction.

JACOBS, J. (dissenting). During oral argument the State acknowledged that the word "openly" in the statute was not to be ignored but was to be given meaning. Though it did not define them, it conceded that some Sunday sales on the premises by the defendant would not be violative of the statute. The concession has been ignored and the majority has given no effect whatever to the word "openly"; it seems to me that this departs from well settled principles of statutory construction. See *Hoffman v. Hock,* 8 *N. J.*

397, 406 (1952); *O'Rourke v. Board of Review*, 24 *N. J.*
607, 610 (1957); *In re General Assignment for Benefit of
Creditors Xaviers, Inc.*, 66 *N. J. Super.* 561, 576 (*App.
Div.* 1961); *Evans v. Ross*, 57 *N. J. Super.* 223, 229 (*App.
Div.* 1959), certif. denied 31 *N. J.* 292 (1959). The dis-
senting opinion by the Chief Justice seeks to give fair
meaning to the word and I subscribe to the conclusion he
has reached. Since that leads me to a reversal of the
defendant's conviction I find no present occasion for dealing
with the existence and scope of any constitutional require-
ments that seventh day observers be afforded exemptions
from Sunday legislation. See Brennan and Stewart, JJ.,
dissenting in *Braunfeld v. Brown*, 366 *U. S.* 599, 81 *S. Ct.*
1144, 6 *L. Ed. 2d* 563, 570 (1961).

SCHETTINO, J. (dissenting). As I have previously indi-
cated by my concurrence in Mr. Justice Francis' dissent in
*Two Guys from Harrison v. Furman*, 32 *N. J.* 199 (1960),
my opinion is that *section* 1 of *Chapter* 119, *L.* 1959, *N. J. S.*
2A :171–5.8 is violative of the equal protection clause of the
Federal *Constitution*. The recent decisions of the United
States Supreme Court in *McGowan v. State of Maryland*,
366 *U. S.* 420, 81 *S. Ct.* 1153, 1218, 6 *L. Ed. 2d* 393 (1961);
*Two Guys from Harrison-Allentown, Inc. v. McGinley*, 366
*U. S.* 582, 81 *S. Ct.* 1185, 6 *L. Ed. 2d* 551 (1961); *Braun-
feld v. Brown*, 366 *U. S.* 599, 81 *S. Ct.* 1144, 6 *L. Ed. 2d*
563 (1961); and *Gallagher v. Crown Kosher Super Market*,
366 *U. S.* 617, 81 *S. Ct.* 1122, 6 *L. Ed. 2d* 536 (1961), do
not appear to me to dispose of this question in view of
the absence of a general New Jersey statute designed to set
aside Sunday as a day of rest and relaxation. See Mr.
Justice Francis' discussion on that point, 32 *N. J.*, at *pp.*
253–255. If this position is sound, the statutory basis for
the instant conviction is void and we do not reach the ques-
tion of its effect upon defendant's right to the free exercise
of his religion.

Assuming, however, that the statute is constitutional, Fass falls within the exception enacted for the benefit of Sabbatarians, *N. J. S.* 2A:171–4. On this issue, I concur in the opinion of Chief Justice WEINTRAUB as to his interpretation of "openly expose to sale."

*For affirmance*—Justices FRANCIS, PROCTOR, HALL and HANEMAN—4.

*For reversal*—Chief Justice WEINTRAUB, and Justices JACOBS and SCHETTINO—3.