RIGHT TO CHOOSE: E. M., P. B., A. C., D. T., E. R., ON BEHALF OF E., A MINOR, AND D. C. ON BEHALF OF K., A MINOR, ALL ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED; EDWARD S. MILNER, JR., M. D.; NEW JERSEY WELFARE RIGHTS ORGANIZATION, AND NEW JERSEY RELIGIOUS COALITION FOR ABORTION RIGHTS, PLAINTIFFS-RESPONDENTS AND CROSS-APPELLANTS, v. BRENDAN T. BYRNE, GOVERNOR, STATE OF NEW JERSEY; JOHN J. DEGNAN, ATTORNEY GENERAL, STATE OF NEW JERSEY; ANN KLEIN, COMMISSIONER, DEPARTMENT OF HUMAN SERVICES, STATE OF NEW JERSEY; G. THOMAS RITI, DIRECTOR, DIVISION OF HUMAN SERVICES, STATE OF NEW JERSEY; THOMAS M. RUSSO, ACTING DIRECTOR, DIVISION OF MEDICAL ASSISTANCE AND HEALTH SERVICES, DEPARTMENT OF HUMAN SERVICES, STATE OF NEW JERSEY, AND JOANNE E. FINLEY, COMMISSIONER, DEPARTMENT OF HEALTH, STATE OF NEW JERSEY, DEFENDANTS-APPELLANTS AND CROSS-RESPONDENTS, AND JOHN T. SCULLY, M. D., F.A.C.S., AS GUARDIAN ON BEHALF OF THOSE CONCEIVED BUT UNBORN HEREIN AND ON BEHALF OF OTHERS SIMILARLY SITUATED; DOMINIC A. INTROCASO, M. D., F.A.C.O.G.; ANTHONY P. DESPIRITO, M. D., F.A.A.P.; THE NEW JERSEY RIGHT TO LIFE COMMITTEE; THE STUDENT AD HOC COMMITTEE AGAINST THE WAR IN VIETNAM, AND NEW JERSEY CONCERNED TAXPAYERS, AN ASSOCIATION, INTERVENORS-RESPONDENTS.

Argued May 3, 1982—Decided August 18, 1982.

See also, 165 N.J.Super. 443.

290

*Michael R. Cole,* Assistant Attorney General, argued the cause for appellants and cross-respondents (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *Stephen Skillman,* former Assistant Attorney General, and *Michael R. Cole,* of counsel; *Andrea M. Silkowitz,* Deputy Attorney General, on the briefs).

*Nadine Taub* and *Louis Raveson* argued the cause for respondents and cross-appellants (*Nadine Taub* and *Louis Raveson,* attorneys; *Nadine Taub, Louis Raveson, Joan Vermeulen* and *Claudia Davidson,* on the briefs).

*Stephen J. Foley* argued the cause for intervenors-respondents (*Campbell, Foley, Lee, Murphy & Cernigliaro,* attorneys).

*Pamela Kaufelt* submitted a brief on behalf of *amici curiae* Planned Parenthood Federation of America, Inc.; Association of Planned Parenthood Physicians, Inc.; Conference of New Jersey Planned Parenthood Affiliates, Inc. and Certain Physicians and Family Planning Nurse Practitioners (*Pamela Kaufelt,* attorney; *Eve W. Paul* and *Dara Klassel,* members of the New York bar, of counsel).

*Randall W. Westreich* submitted a brief on behalf of *amici curiae* New Jersey Coalition for Battered Women, New Jersey Committee for Abortion Rights and Against Sterilization Abuse (CARASA); Women's Equity Action League (WEAL) and Women's Resource and Survival Center.

*Nancy Goldhill* submitted a brief on behalf of *amici curiae* National Association of Social Workers, Inc., New Jersey Chapter; National Association of Social Workers; National Conference of Black Lawyers; Women's Affirmative Action Committee of the New Jersey State Industrial Union Council AFL–CIO; Hispanic Political Action Committee of New Jersey; Peoples Independent Coalition; Northern New Jersey Chapter of the Coalition of Labor Union Women and New Jersey Chapter of the National Lawyers Guild.

*Morton Stavis* submitted a brief on behalf of *amici curiae* American Humanist Association; Interreligious Foundation for

Community Organization; Union of American Hebrew Congregations; Unitarian Universalist Association; Unitarian Universalist Women's Federation and Women's Division, General Board of Global Ministries of the United Methodist Church (*Morton Stavis*, attorney; *Rhonda Copelon*, a member of the New York bar, of counsel).

*Gloria B. Cherry* on behalf of *amicus curiae* League of Women Voters of New Jersey joined in the brief submitted on behalf of *amici curiae* National Association of Social Workers, et al.

The opinion of the Court was delivered by

POLLOCK, J.

This appeal presents the question of the validity under the New Jersey Constitution of a statute that prohibits Medicaid funding for abortions "except where it is medically indicated to be necessary to preserve the woman's life." *N.J.S.A.* 30:4D–6.1 (1981). Medicaid pays for the costs of all childbirths and abortions to save the life of the mother but, because of the statutory prohibition, does not pay for those therapeutic abortions needed to protect the health of the mother or for elective, nontherapeutic abortions.

Originally plaintiffs claimed that the denial of Medicaid funds violated rights assured by the due process and equal protection clauses of the New Jersey and United States Constitutions. The Chancery Division found the statute violated a fundamental right to health under both Constitutions. Consequently, that court declared the statute invalid and awarded attorneys' fees to plaintiffs as the prevailing party in a federal civil rights claim. After an appeal had been taken to the Appellate Division, we granted direct certification. 88 *N.J.* 472 (1981).

Following the Chancery Division decision, however, the United States Supreme Court in *Harris v. McRae,* 448 *U.S.* 297, 100 *S.Ct.* 2671, 65 *L.Ed.*2d 784 (1980), determined that the federal Constitution does not invest pregnant women with the right to Medicaid funds for abortions. Although we are bound to honor

that determination of plaintiffs' federal constitutional rights, we conclude that under the New Jersey Constitution the State may not restrict funds to those abortions to preserve a woman's life, but not her health. We conclude further that the New Jersey Constitution does not require the funding of elective, nontherapeutic abortions. Without determining whether a constitutional right to health exists in New Jersey, we find that the statute violates the right of pregnant women to equal protection of the law under *Art.* I, *par.* 1 of the New Jersey Constitution. Accordingly, we modify and affirm the declaration of the invalidity of *N.J.S.A.* 30:4D–6.1, 169 *N.J.Super.* 543. Although plaintiffs have succeeded in their state constitutional claim, they have not prevailed on the federal constitutional claims, and we reverse the award of attorneys' fees, 173 *N.J.Super.* 66.

## I

In recent years abortion has generated an intense public debate, which is reflected in constantly changing federal and state legislative and administrative responses. With the decision of the United States Supreme Court in *Roe v. Wade,* 410 *U.S.* 113, 93 *S.Ct.* 705, 35 *L.Ed.*2d 147 (1973), the issue assumed a new dimension.[1] In that case, the Court ruled that during the first trimester of a pregnancy the state has no role in the abortion decision, which "must be left to the medical judgment of the pregnant woman's attending physician." *Id.* at 164, 93

---

[1]The controversy concerning the proper role of the government with respect to abortions will continue after this opinion. The United States Supreme Court has granted *certiorari* to hear cases involving whether the government may require hospitalization for abortions, parental consent for abortions on minors, signature on an informed consent form, a 24-hour hiatus between informed consent and the performance of the abortion, and taking of tissue sample to be submitted for pathology report. *Simpoulos v. Virginia,* —— *U.S.* ——, 102 *S.Ct.* 2265, 73 *L.Ed.*2d 1281 (1982); *City of Akron v. Akron Center for Reproductive Health,* —— *U.S.* ——, 102 *S.Ct.* 2266, 73 *L.Ed.*2d 1282; *Planned Parenthood Ass'n of Kansas City, Mo. v. Ashcroft,* —— *U.S.* ——, 102 *S.Ct.* 2267, 73 *L.Ed.*2d 1282. We need not address these issues in this case.

*S.Ct.* at 732. In the second trimester, the state may "regulate the abortion procedure in ways that are reasonably related to maternal health." *Id.* During the third trimester, the state may "regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Id.* at 164–65, 93 *S.Ct.* at 732.

After *Roe v. Wade,* indigent women received funding for abortions under Medicaid, a joint federal-state program of medical care for the needy. In the three years between the *Roe v. Wade* decision and the enactment of *N.J.S.A.* 30:4D–6.1 in 1975, New Jersey did not restrict state Medicaid funding for abortions. *See* Statement to S–528 (1975); *Right to Choose v. Byrne,* 165 *N.J.Super.* 443, 446 (Ch.Div.1979) (*Right to Choose I*). In *N.J.S.A.* 30:4D–6.1, however, the New Jersey Legislature restricted state Medicaid funds to abortions needed to preserve the life, but not the health, of the mother. Subsequently, in September, 1976, Congress adopted the first version of the "Hyde Amendment," which, in terms similar to the present version[2], provided that federal Medicaid funds should not be used to pay for abortions except where the life of the mother would be endangered. *Pub.L.No.* 94–439, § 209, 90 *Stat.* 1434. The 1977 version of the Hyde Amendment, *Pub.L.No.* 95–205, 91 *Stat.* 1460, however, extended the permissible use of Medicaid funds to situations in which the mother was the victim of rape or incest, or where two physicians determined "severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term. . . ." Although that version of the Hyde Amendment permitted funding for abortions to prevent serious injury, *N.J.S.A.* 30:4D–6.1 restricts funding to abortions to preserve the life of the mother. Thus,

---

[2]The current version of the Hyde Amendment provides further that "the several states are and shall remain free not to fund abortions to the extent that they in their sole discretion deem appropriate." *Pub.L.No.*97–12, 95 *Stat.* 96.

the state statute is more restrictive than the 1977 Hyde Amendment.

In that context, plaintiffs filed their original complaint in June, 1978 challenging the statute on a variety of grounds. Plaintiffs alleged the funding restriction violated the federal Medicaid Act as well as provisions of the federal and state Constitutions, including those that guarantee equal protection of the laws. They also asserted that the statute constituted the establishment of religion and impinged upon their free exercise of religion. The action has led to three opinions by the Chancery Division, as well as a final judgment on March 28, 1979 and a supplemental final judgment on March 19, 1980. *Right to Choose I,* 165 *N.J.Super.* 443; *Right to Choose v. Byrne,* 169 *N.J.Super.* 543 (1979) (*Right to Choose II*); *Right to Choose v. Byrne,* 173 *N.J.Super.* 66 (1979) (*Right to Choose III*).

In its first opinion, the Chancery Division described the parties:

> Plaintiffs are four women who were pregnant when their complaint or amended complaint was filed, two mothers on behalf of minor daughters who were then pregnant, a medical doctor, two nonprofit associations formed to protect abortion and welfare rights, and a religious association for abortion rights.

> In accordance with *R.R.* 4:32–1, 2, this court certified the individual plaintiffs as representatives of two classes: Medicaid-eligible women who are seeking funding for elective nontherapeutic abortions and for abortions which are medically necessary for the protection of their health, although their pregnancies are not life-threatening.

> &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

> Defendants are state officials with responsibility for the administration of the State Medicaid statute. Defendant intervenors are three medical doctors, a nonprofit corporation formed to oppose abortion, a nonprofit association of students opposing the war in Vietnam and a nonprofit taxpayers association.

[*Right to Choose I,* 165 *N.J.Super.* at 448–49].

In assaying the consequences of *N.J.S.A.* 30:4D–6.1 and its validity under the federal Medicaid Act, the court concluded that the conflict between the statute and the Medicaid Act, even when construed in light of the 1977 version of the Hyde Amendment, constituted a breach of New Jersey's obligation to provide

its share of Medicaid funding for necessary medical services. *Right to Choose I,* 165 *N.J.Super.* at 454. Therefore, the Chancery Division enjoined defendants from enforcing *N.J.S.A.* 30:4D–6.1 and ordered the issuance of guidelines for funding medically necessary abortions.

The court found further that plaintiffs "were foreclosed from arguing as a matter of federal constitutional law that the withholding of Medicaid funding for elective nontherapeutic abortions is a denial of equal protection of the law . . . ." *Right to Choose I,* 165 *N.J.Super.* at 455–56. It reached that conclusion by relying on *Maher v. Roe,* 432 *U.S.* 464, 97 *S.Ct.* 2376, 53 *L.Ed.*2d 484 (1977), which upheld the validity of a Connecticut statute prohibiting the use of Medicaid funds for nontherapeutic abortions.

Also in *Right to Choose I,* the Chancery Division rejected plaintiffs' claims that *N.J.S.A.* 30:4D–6.1 establishes as a state policy the views of the Roman Catholic Church that life begins at conception, 165 *N.J.Super.* at 459; that the Roman Catholic Church became excessively entangled in the legislative process, *id.* at 460; and that the statute interfered with the free exercise of religion. *Id.* at 462–63.

In response to the court order in *Right to Choose I,* the Department of Human Services proposed guidelines incorporating the terms of the 1977 Hyde Amendment. That amendment permitted funding for abortions " 'where the life of the mother would be endangered . . . for the victims of rape or incest . . . or . . . [in] those instances where severe and long-lasting physical damage to the mother would result if the pregnancy were carried to term when so determined by two physicians.' " *Right to Choose II,* 169 *N.J.Super.* at 546, quoting *Pub.L.No.* 95–480, 92 *Stat.* 1586.

In sustaining plaintiffs' equal protection challenge in *Right to Choose II,* the Chancery Division found that the regulations

discriminated "against Medicaid eligible women with a medical necessity for an abortion without warrant of a compelling state interest, in violation of equal protection of the law." 169 *N.J.Super.* at 552. Underlying that holding was the court's conclusion that:

[E]njoyment of one's health is a fundamental liberty which is shielded by the Fourteenth Amendment to the Federal Constitution and by Article 1, paragraph 1, of the State Constitution against unreasonable and discriminatory restriction. Medicaid funding is in furtherance of that fundamental liberty.

The effect of the proposed guidelines would be to withhold funding for one medically necessary procedure and one only, an abortion to protect a woman's health, although such funding was previously available.

[*Id.* at 551].

That conclusion also underlay the declaration in the supplemental final judgment that *N.J.S.A.* 30:4D–6.1 violated the equal protection clause of the Fourteenth Amendment of the United States Constitution and *Art.* I, *par.* 1 of the New Jersey Constitution. Having declared the statute unconstitutional, the court enjoined defendants to fund all Medicaid abortions except elective, nontherapeutic abortions and those to prevent insignificant impairments to health. 169 *N.J.Super.* at 552.

Thereafter the Department issued new regulations, effective May 1, 1980, declaring that "Medicaid will pay for all medically necessary abortions." *N.J.A.C.* 10:53–1.14(a). Furthermore, in determining whether an abortion is medically necessary, a physician may consider: "(1) Physical, emotional, and psychological factors; (2) Family reasons; (3) Age." *Id.* at (b).

The injunction and new regulations have had a significant effect on the availability of abortions. In *Right to Choose I,* the court found that, while the statute was in effect, births to Medicaid-eligible women increased by 30% but the number of Medicaid-funded abortions declined from a monthly average exceeding 900 to fewer than 25. 165 *N.J.Super.* at 457. We were informed at oral argument that during fiscal year 1981, while the injunction and regulations have been in effect, the

federal and state governments funded 6,118 abortions: 2,374 were jointly funded and 3,744 were solely state funded.[3]

In its final opinion, the Chancery Division granted plaintiffs' claim for attorneys' fees under 42 *U.S.C.A.* § 1988, which permits the court, in its discretion, to award attorneys' fees to the prevailing party in any action to enforce certain federal civil rights. Although the attorneys' affidavits failed to segregate time spent on the prevailing issues, the Chancery Division awarded counsel fees to two of the organizations representing plaintiffs: Essex-Newark Legal Services was awarded $13,500 and Rutgers Women's Rights Litigation Clinic was awarded $6,375. *Right to Choose III*, 173 *N.J.Super.* at 74.

Shortly after the decision in *Right to Choose III*, however, the United States Supreme Court sustained a more restrictive version of the Hyde Amendment, a version that prohibited the use of Medicaid funds for abortions except where the life of the mother was endangered. *Harris v. McRae*, 448 *U.S.* 297, 325 n.27, 100 *S.Ct.* 2671, 2692 n.27, 65 *L.Ed.*2d 784 (1980). In effect, *McRae* overruled the declaration of the Chancery Division in *Right to Choose II* that funding Medicaid abortions to protect the life, but not the health, of the mother violated the equal protection clause of the federal Constitution.[4] *McRae, supra*, 448 *U.S.* at 322–27, 100 *S.Ct.* at 2691–2694.

A further effect of *McRae* was to affirm the Chancery Division's decision that the denial of Medicaid funds for abortion did

---

[3]The State does not justify the enactment of the challenged statute as a fiscal measure. Indeed, the Chancery Division found that "Medicaid funding for childbirths without complications is $236, but for abortions without complications only $79." *Right to Choose II*, 169 *N.J.Super.* at 549.

[4]On the same date that it rendered the *McRae* decision, the Court applied the rationale of that case to sustain an Illinois statute that, like *N.J.S.A.* 30:4D-6.1, prohibited Medicaid funds for all abortions except those to preserve the life of the mother. *Williams v. Zbaraz*, 448 *U.S.* 358, 100 *S.Ct.* 2694, 65 *L.Ed.*2d 831 (1980). The majority and dissenting opinions in *Zbaraz* relied on the opinions in *McRae*. *Id.* at 369. Therefore, we shall refer to the federal equal protection analysis contained in *McRae*.

not violate the federal constitutional provision against the establishment of religion. Because plaintiffs in *McRae* lacked standing, the United States Supreme Court declined to reach the claim that the Hyde Amendment violated the free exercise of their religion. *Id.* at 320, 100 *S.Ct.* at 2689–2690. Thus, *McRae* effectively remitted plaintiffs to the contention that the statute violated those provisions of the New Jersey Constitution concerning religion and equal protection. *N.J.Const.* (1947), *Art.* I, *pars.* 1, 3 & 4.

Before evaluating plaintiffs' claim under the New Jersey Constitution, it is advisable that we set the limits of this opinion by stating what it excludes. It is not a referendum on the morality of abortion. We do not presume to answer the profound questions about the moral, medical, and societal implications of abortion. Nor do we undertake to determine when life begins or at what point a fetus is a person. Our mission is to decide the extent to which the New Jersey Constitution permits a statutory restriction on funding for abortions.

II

Fundamental to our decision is the role of a state court of last resort in our federalist system. Inherent in that role is the interplay between, on the one hand, the individual states, their Constitutions, and courts; and, on the other hand, the federal government, its Constitution, and the Supreme Court. Understanding of the relationship between the United States Supreme Court and a state Supreme Court as interpreters of constitutional rights begins with the recollection that the original states, including New Jersey, and their Constitutions preceded the formation of the federal government and its Constitution. *See People v. Brisendine,* 13 *Cal.*3d 528, 550, 531 *P.*2d 1099, 1113, 119 *Cal.Rptr.* 325, 329 (1975).

Over the past two centuries, however, the United States Constitution has emerged as the primary source of fundamental rights. Note, "Developments in the Law—The Interpretation of

State Constitutional Rights," 95 *Harv.L.Rev.* at 1326, 1328 (1982) ("State Constitutional Rights"). Nevertheless, in recent years, distinguished jurists and scholars have encouraged state courts, in appropriate cases, to look more closely to their own Constitutions as fonts of individual rights. Although the federal Constitution may remain as the basic charter, state Constitutions may serve as a supplemental source of fundamental liberties. *See generally* Brennan, "State Constitutions and the Protection of Individual Rights," 90 *Harv.L.Rev.* 489 (1977).

From that perspective, state Constitutions are separate sources of individual freedoms, *State v. Schmid,* 84 *N.J.* 535, 553 (1980), and restrictions on the exercise of power by the Legislature. *State v. Saunders,* 75 *N.J.* 200, 225–26 (1977) (Schreiber, J., concurring). By contrast, the United States Constitution is a grant of enumerated powers to the federal government. *Id. See Gangemi v. Berry,* 25 *N.J.* 1 (1957). *See generally* "State Constitutional Rights," *supra,* 95 *Harv.L.Rev.* at 1326–28. Thus, in appropriate cases, the individual states may accord greater respect than the federal government to certain fundamental rights. Although the state Constitution may encompass a smaller universe than the federal Constitution, our constellation of rights may be more complete.

Indeed, the United States Supreme Court itself has long proclaimed that state Constitutions may provide more expansive protection of individual liberties than the United States Constitution. *See, e.g., Oregon v. Kennedy,* —— *U.S.* ——, ——, 102 *S.Ct.* 2083, 2092, 72 *L.Ed.2d* 416, 428 (1982) (Brennan, J., concurring); *PruneYard Shopping Center v. Robins,* 447 *U.S.* 74, 81, 100 *S.Ct.* 2035, 2040–41, 64 *L.Ed.2d* 741 (1980); *id.* at 91–92, 100 *S.Ct.* at 2040 (Marshall, J., concurring); *Oregon v. Haas,* 420 *U.S.* 714, 719, 95 *S.Ct.* 1215, 1219, 43 *L.Ed.2d* 570 (1975); *Cooper v. California,* 386 *U.S.* 58, 62, 87 *S.Ct.* 788, 791, 17 *L.Ed.2d* 730 (1967).

In addition, this Court has recognized that our state Constitution may provide greater protection than the federal Constitu-

tion. *See, e.g., State v. Alston,* 88 *N.J.* 211, 227–28 (1981) (standing to challenge searches and seizures); *In re Grady,* 85 *N.J.* 235, 249 (1981) (the right to sterilization); *State v. Schmid,* 84 *N.J.* 535, 559 (1980) (free speech protected in some instances against private interference); *State v. Baker,* 81 *N.J.* 99, 112–13 (1979) (the right of unrelated persons to live as a single unit); *State v. Johnson,* 68 *N.J.* 349, 353 (1975) (consent to search); *Southern Burlington Cty. NAACP v. Township of Mt. Laurel,* 67 *N.J.* 151, 174–75 (1975) (exclusionary zoning); *Robinson v. Cahill,* 62 *N.J.* 473, 482, 509 *cert. denied sub. nom. Dickey v. Robinson,* 414 *U.S.* 976, 94 *S.Ct.* 292, 38 *L.Ed.2d* 219 (1973) (fundamental right to thorough and efficient public education).

▮ Nonetheless, we proceed cautiously before declaring rights under our state Constitution that differ significantly from those enumerated by the United States Supreme Court in its interpretation of the federal Constitution. *See State v. Hunt,* 91 *N.J.* 338, 344–345 (1982); *id.* at 362–363 (Handler, J., concurring). Our caution emanates, in part, from our recognition of the general advisability in a federal system of uniform interpretation of identical constitutional provisions. Where provisions of the federal and state Constitutions differ, however, or where a previously established body of state law leads to a different result, then we must determine whether a more expansive grant of rights is mandated by our state Constitution. *See generally* "State Constitutional Rights," *supra,* 95 *Harv.L.Rev.* at 1361.

## III

Against this background, we consider the implications of the decision of the United States Supreme Court in *Harris v. McRae,* 448 *U.S.* 297, 100 *S.Ct.* 2671, 65 *L.Ed.2d* 784 (1980). In *McRae,* the five-member majority found that the version of the Hyde Amendment that prohibited Medicaid funds for abortions except when necessary to save the life of the mother bore a rational relationship to government's "legitimate interest in protecting

the potential life of the fetus." 448 *U.S.* at 324, 100 *S.Ct.* at 2692.

The majority opinion precipitated vigorous dissents from four members of the Court, who attacked that opinion at several points. Of particular relevance is the dissenters' contention that, by denying Medicaid funds for medically necessary abortions, the Hyde Amendment was not supported by a sufficiently compelling state interest to justify its restriction on the exercise of the fundamental right to choose an abortion. In his dissent, Justice Stevens stated that the Court's earlier decision in *Roe v. Wade* prevented the State from "exclud[ing] a woman from medical benefits to which she would otherwise be entitled solely to further an interest in potential life when a physician, 'in appropriate medical judgment,' certifies that an abortion is necessary 'for the preservation of the life or health of the mother.'" 448 *U.S.* at 352, 100 *S.Ct.* at 2713 (citations omitted). He found a denial of equal protection to a class consisting of poor pregnant women who, under Medicaid, had a right to necessary medical treatment. Those women "are confronted with a choice between two serious harms: serious health damage to themselves on the one hand and abortion on the other." *Id.* at 350, 100 *S.Ct.* at 2712. He found further that the denial of funds for medically necessary abortions was "tantamount to severe punishment." *Id.* at 354, 100 *S.Ct.* at 2714. Consequently, protection of potential life could not be used as a reason to deny indigent women necessary medical care.

Justice Brennan, with whom Justices Marshall and Blackmun joined, concurred with Justice Stevens:

> I agree entirely with my Brother Stevens that the State's interest in protecting the potential life of the fetus cannot justify the exclusion of financially and medically needy women from the benefits to which they would otherwise be entitled solely because the treatment that a doctor has concluded is medically necessary involves an abortion.

[448 *U.S.* at 329, 100 *S.Ct.* at 2702].

The majority in *McRae* concluded that the prohibition on the use of Medicaid funds for abortion to protect the health of the

mother did not violate the equal protection clause of the United States Constitution. Under the supremacy clause, *U.S.Const., Art.* VI, *cl.* 2, that interpretation precludes our reaching a different result as a matter of federal law. We remain obligated, however, to evaluate *N.J.S.A.* 30:4D–6.1 in light of the Constitution of New Jersey.

In more expansive language than that of the United States Constitution, *Art.* I, *par.* 1 of the New Jersey Constitution provides: "All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." The state Bill of Rights, which includes that provision, has been described as expressing " 'the social, political, and economic ideals of the present day in a broader way than ever before in American constitutional history.' " Milmed, "The New Jersey Constitution of 1947" in *N.J.S. A.Const., Arts. I–III* 91 at 110 (1971). By declaring the right to life, liberty and the pursuit of safety and happiness, *Art.* I, *par.* 1 protects the right of privacy, a right that was implicit in the 1844 Constitution. Heckel, "The Bill of Rights," in *II Constitutional Convention of 1947,* 1336 at 1339 (1951).

The right of privacy has been found to extend to a variety of areas, including sexual conduct between consenting adults, *State v. Saunders,* 75 *N.J.* 200, 224–29 (1977) (Schreiber, J., concurring); the right to sterilization, *In re Grady, supra,* 85 *N.J.* at 249; and even the right to terminate life itself. *In re Quinlan,* 70 *N.J.* 10, 19, 40–41, 51 *cert. denied sub nom. Garger v. New Jersey,* 429 *U.S.* 922, 97 *S.Ct.* 319, 50 *L.Ed.*2d 289 (1976). These cases establish that "under some circumstances, an individual's personal right to control her own body and life overrides the State's general interest in preserving life." *In re Grady, supra,* 85 *N.J.* at 249.

In recent years, moreover, a body of law has developed in New Jersey acknowledging a woman's right to choose whether

to carry a pregnancy to full-term or to undergo an abortion. Even before *Roe v. Wade,* this Court intimated that a woman who had contracted rubella during her pregnancy had a right to choose whether to give birth to a defective child or undergo an abortion. *See Gleitman v. Cosgrove,* 49 *N.J.* 22, 62–63 (1967) (Weintraub, C. J., dissenting in part). That intimation became a reality in *Berman v. Allen,* 80 *N.J.* 421, 432 (1979), in which the Court held that a woman had a cause of action for deprivation of the right to decide whether to bear a child with Down's Syndrome. We reaffirmed that right last year in *Schroeder v. Perkel,* 87 *N.J.* 53, 66 (1981), holding that a mother, after giving birth to a child with cystic fibrosis, had a right to choose whether to conceive a second child who might suffer from the same genetic defect. *See Comras v. Lewin,* 183 *N.J.Super.* 42 (App.Div.1982) (negligent deprivation of right to choose to abort). *See also Doe v. Bridgeton Hospital Ass'n, Inc.,* 71 *N.J.* 478 (1976) (private non-profit hospital may not use moral concepts to limit common-law right of access to quasi-public hospital facilities for elective abortions).

Although we decline to proceed as far as the Chancery Division in declaring that the New Jersey Constitution guarantees a fundamental right to health, *Right to Choose II, supra,* 169 *N.J.Super.* at 551, we recognize that New Jersey accords a high priority to the preservation of health. More than 70 years ago, Chancellor Pitney recognized that

[a]mong the most [important] of personal rights, without which man could not live in a state of society, is the right of personal security, including 'the preservation of a man's health from such practices as may prejudice or annoy it,' a right recognized, needless to say, in almost the first words of our written Constitution.

[*Tomlinson v. Armour & Co.,* 75 *N.J.L.* 748, 757 (E. & A. 1908) (citations omitted)].

With these long-standing principles of state law in mind, we assess whether the restriction of Medicaid reimbursement to abortions to protect the life of the mother is compatible with the state guarantee of equal protection of the laws. In New Jersey, equal protection of the laws is assured not only by the Four-

teenth Amendment to the United States Constitution, but also by *Art.* I, *par.* 1 of the state Constitution. *Levine v. Dep't of Insts. & Agencies,* 84 *N.J.* 234, 257 (1980); *Jersey Shore Medical Center v. Estate of Baum,* 84 *N.J.* 137, 148 (1980). In construing the constitutional guarantees of equal protection, this Court has frequently applied a similar standard of review, whether the guarantee arose from the state or federal Constitution. *Levine v. Dep't of Insts. & Agencies, supra,* 84 *N.J.* at 257.

Conventional equal protection analysis employs "two tiers" of judicial review. Briefly stated, if a fundamental right or suspect class is involved, the legislative classification is subject to strict scrutiny; the state must establish that a compelling state interest supports the classification and that no less restrictive alternative is available. With other rights and classes, however, the legislative classification need be only rationally related to a legitimate state interest. *United States Chamber of Commerce v. State,* 89 *N.J.* 131, 157–58 (1982).

Neither poverty nor pregnancy gives rise to membership in a suspect class. *See Maher v. Roe,* 432 *U.S.* 464, 470, 97 *S.Ct.* 2376, 2380, 53 *L.Ed.*2d 484 (1977); *San Antonio School Dist. v. Rodriguez,* 411 *U.S.* 1, 28–29, 93 *S.Ct.* 1278, 1293–94, 36 *L.Ed.* 2d 16 (1973); *Taxpayers Ass'n v. Weymouth Tp.,* 80 *N.J.* 6, 38 n.15 (1976), *appeal dismissed,* 430 *U.S.* 977, 97 *S.Ct.* 1672, 52 *L.Ed.*2d 373 (1977). Nor is there a fundamental right to funding for an abortion. *Harris v. McRae, supra,* 448 *U.S.* at 316, 100 *S.Ct.* at 2687–88; *Maher v. Roe,* 432 *U.S.* at 469, 97 *S.Ct.* at 2380. The right to choose whether to have an abortion, however, is a fundamental right of all pregnant women, including those entitled to Medicaid reimbursement for necessary medical treatment. As to that group of women, the challenged statute discriminates between those for whom medical care is necessary for childbirth and those for whom an abortion is medically necessary. Under *N.J.S.A.* 30:4D–6.1, those needing abortions receive funds only when their lives are at stake. By granting funds when life is at risk, but withhold-

ing them when health is endangered, the statute denies equal protection to those women entitled to necessary medical services under Medicaid.

Thus, the statute impinges upon the fundamental right of a woman to control her body and destiny. That right encompasses one of the most intimate decisions in human experience, the choice to terminate a pregnancy or bear a child. This intensely personal decision is one that should be made by a woman in consultation with trusted advisers, such as her doctor, but without undue government interference. In this case, however, the State admittedly seeks to influence the decision between abortion and childbirth. Indeed, it concedes that, for a woman who cannot afford either medical procedure, the statute skews the decision in favor of childbirth at the expense of the mother's health.

To justify the discrimination, the State asserts as its compelling interest the protection of potential life. Although that is a legitimate state interest, at no point in a pregnancy may it outweigh the superior interest in the life and health of the mother. *Roe v. Wade, supra,* 410 *U.S.* at 163–65, 93 *S.Ct.* at 731–33. Yet the funding restriction gives priority to potential life at the expense of maternal health. From a different perspective, the statute deprives indigent women "of a governmental benefit for which they are otherwise eligible, solely because they have attempted to exercise a constitutional right." *Harris v. McRae, supra,* 448 *U.S.* at 346, 100 *S.Ct.* at 2710 (Marshall, J., dissenting).

Concededly, the Legislature need not fund any of the costs of medically necessary procedures pertaining to pregnancy; conversely, it could include in its Medicaid plan medically necessary abortions for which federal reimbursement is not available. *Id.* at 311 n.16, 100 *S.Ct.* at 2685 n.16. Once it undertakes to fund medically necessary care attendant upon pregnancy, however,

government must proceed in a neutral manner.[5] Given the high priority accorded in this State to the rights of privacy and health, it is not neutral to fund services medically necessary for childbirth while refusing to fund medically necessary abortions. Nor is it neutral to provide one woman with the means to protect her life at the expense of a fetus and to force another woman to sacrifice her health to protect a potential life.[6]

---

[5]In his separate opinion, Justice Pashman concludes that a woman has a right under the New Jersey Constitution to funding for an elective or nontherapeutic abortion. He correctly notes that we find no such right to funding. Justice O'Hern, in his dissenting opinion, reaches a conclusion diametrically opposed to that of Justice Pashman. That is, Justice O'Hern concludes that the State has no obligation to fund any abortions, therapeutic or nontherapeutic.

Both opinions misperceive the constitutional right. Justice Pashman errs in construing the right as imposing a correlative duty on government to fund all abortions. The flaw in his analysis is in failing to recognize that the right of the individual is freedom from undue government interference, not an assurance of government funding. Justice O'Hern, on the other hand, errs by failing to recognize that once government enters the zone of privacy surrounding a pregnant woman's right to choose, it must act impartially. In that constitutionally protected zone, the State may be an umpire, but not a contestant.

[6]This distinction between life and health is not rationally related to any legitimate state interest. Thus, the statute would fail even the minimum rationality test. Although the State has a legitimate interest in protecting potential life, that interest ceases to be legitimate when the result is to deprive a woman of her right to choose to protect her life and health.

The State, however, may draw a rational distinction between medically necessary abortions and nontherapeutic abortions that do not implicate the health of the mother. With respect to nontherapeutic abortions, the State may pursue its interest in protecting potential life, without impairing the life or health of the mother. That conclusion is consistent with the essential purpose of Medicaid, which is to provide necessary medical care for the indigent. N.J.S.A. 30:4D–5; N.J.A.C. 10:49–1.4.

Moreover, the distinction between life and health may be difficult for even the most discerning physician. In this case, uncontroverted medical evidence established that pregnancy increases the health risks for many women with preexisting diseases such as sickle cell anemia, diabetes or hypertension, as well as heart, kidney, or lung disease. Furthermore, some of these diseases may be health-threatening early in a pregnancy, but life-threatening as the pregnancy approaches full term. Additionally, some

By controlling funds for schools, prisons, highways, housing, welfare, and other public needs, the legislative and executive branches fulfill the definition of our constitutional rights. Those two branches properly enjoy wide latitude in making fiscal decisions, but the State may not use its treasury to persuade a poor woman to sacrifice her health by remaining pregnant. Statutes such as *N.J.S.A.* 30:4D–6.1 "can be understood only as an attempt to achieve with carrots what government is forbidden to achieve with sticks." L. Tribe, *American Constitutional Law,* § 15–10 at 933 n.77 (1978). The statute affects the right of poor pregnant women to choose between alternative necessary medical services. No compelling state interest justifies that discrimination, and the statute denies equal protection to those exercising their constitutional right to choose a medically necessary abortion.

Although we have employed the conventional two-tiered equal protection analysis, the conflicting individual and governmental interests do not easily fit into a rigid analytical structure. *See Matthews v. Atlantic City,* 84 *N.J.* 153, 165 (1980).

Nearly ten years ago, Chief Justice Weintraub wrote:

Mechanical approaches to the delicate problem of judicial intervention under either the equal protection or the due process clauses may only divert a court

medical conditions that endanger a woman's health arise for the first time during pregnancy, while others may go undetected until pregnancy. When an abortion is medically necessary is a decision best made by the patient in consultation with her physician without the complication of deciding if that procedure is required to protect her life, but not her health.

For many indigent women, the denial of Medicaid funds, as a practical matter, forecloses the option of obtaining a medically necessary abortion. More affluent women need not avail themselves of public funds for necessary medical procedures. Through private resources or third-party payors, they can protect their health without recourse to Medicaid. Only those least able to bear the financial burden will be forced into childbirth at the expense of their health.

If the purpose of the statute is to protect potential life by depriving indigent women of their right to protect their health, the statute, in that sense, is rational. But it is that ruthless rationality that our Constitution will not condone.

from the meritorious issue or delay consideration of it. Ultimately, a court must weigh the nature of the restraint or the denial against the apparent public justification, and decide whether the State action is arbitrary. In that process, if the circumstances sensibly so require, the court may call upon the State to demonstrate the existence of a sufficient public need for the restraint or the denial.

[*Robinson v. Cahill,* 62 *N.J.* 473, 491–92, *cert. denied sub. nom Dickey v. Robinson,* 414 *U.S.* 976, 94 *S.Ct.* 292, 38 *L.Ed.2d* 219 (1973) ].

Shortly thereafter the Court rejected a rigid equal protection test based either on mere rationality or strict scrutiny. *Collingswood v. Ringgold,* 66 *N.J.* 350, 370 (1975), *appeal dismissed,* 426 *U.S.* 901, 96 *S.Ct.* 2220, 48 *L.Ed.2d* 826 (1976). The following year, the Court employed a balancing test in analyzing equal protection claims under the state Constitution. Writing for a unanimous Court, Justice Pashman stated: "[W]here an important personal right is affected by governmental action, the Court often requires the public authority to demonstrate a greater 'public need' than is traditionally required in construing the federal constitution." [7] *Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp., supra,* 80 *N.J.* at 43.

---

[7] Members of the United States Supreme Court, who recognize that the two-tiered analysis is not always appropriate, have resorted to a middle-tier or intermediate level of scrutiny. *Matthews v. Atlantic City, supra,* 84 *N.J.* at 165, and cases cited therein. Under this intermediate standard, the judicial role is to determine whether the legislative classification substantially relates to an important governmental interest. *See generally United States Chamber of Commerce v. State,* 89 *N.J.* 131, 157–59 (1982). In a recent equal protection decision, the United States Supreme Court employed a balancing approach· in determining that a state statute that prohibited the children of illegal aliens from attending public schools violated the equal protection clause. A majority of the Justices stated that, although illegal aliens are not a suspect class and education is not a fundamental right, the statute must be supported by a governmental interest more important than the children's interest in an education. *See Plyler v. Doe,* —— *U.S.* ——, ——, 102 *S.Ct.* 2382, 2400–01, 72 *L.Ed.2d* 786, 806 (1982); *id.* —— *U.S.* at ——, 102 *S.Ct.* at 2402, 72 *L.Ed.2d* at 808 (Marshall, J., concurring); *id.* —— *U.S.* at —— – ——, 102 *S.Ct.* at 2402–05, 72 *L.Ed.2d* at 808–12 (Blackmun, J., concurring); *id.* —— *U.S.* at —— – ——, 102 *S.Ct.* at 2405–07, 72 *L.Ed.2d* at 812–14 (Powell, J., concurring).

■ This balancing test is particularly appropriate when, as here, the statutory classification indirectly infringes on a fundamental right. *See United States Chamber of Commerce v. State, supra,* 89 *N.J.* at 158; *Matthews v. Atlantic City, supra,* 84 *N.J.* at 167. In balancing the protection of a woman's health and her fundamental right to privacy against the asserted state interest in protecting potential life, we conclude that the governmental interference is unreasonable.[8] Elective, nontherapeutic abortions, however, do not involve the life or health of the mother, and the State may pursue its interest in potential life by excluding those abortions from the Medicaid program.

Our holding is not that the State is under a constitutional obligation to fund all abortions. Rather, we hold that the State may not jeopardize the health and privacy of poor women by excluding medically necessary abortions from a system providing all other medically necessary care for the indigent. A woman's right to choose to protect her health by terminating her pregnancy outweighs the State's asserted interest in protecting a potential life at the expense of her health. Therefore, we hold that the restriction of funding to abortions necessary to save the life of the mother violates the New Jersey Constitution. It remains to determine the effect of that violation.

---

[8]Weighing these same considerations under their own state Constitutions, the Supreme Courts in California and Massachusetts have invalidated restrictions on Medicaid funding for abortions. *Committee to Defend Reprod. Rights v. Myers,* 29 *Cal.*3d 252, 625 *P.*2d 779, 172 *Cal.Rptr.* 866 (1981); *Moe v. Secretary of Admin. & Finance,* 382 *Mass.* 629, 417 *N.E.*2d 387 (1981). The Massachusetts court relied on a substantive due process analysis, and the California court based its decision on an express state constitutional guarantee of privacy. Both courts recognized equal protection implications of their decisions. Whether expressed in terms of due process or equal protection, these decisions recognize that the state, by denying Medicaid funds, may not interfere with an indigent woman's right to choose a medically necessary abortion.

## IV

 Appraisal of a constitutional defect begins with the assumption that the Legislature intended to act in a constitutional manner. *State v. Profaci,* 56 *N.J.* 346, 349–50 (1970) (limiting statute proscribing loud and profane language in public only to words likely to incite breach of peace or offend listener). With that assumption in mind, we must determine whether the Legislature would want the statute to survive with appropriate modifications rather than succumb to constitutional infirmities. *Jordan v. Horsemen's Benevolent and Protective Ass'n,* 90 *N.J.* 422, 431–32 (1982). Stated otherwise, we must ascertain whether the Legislature would have declined to adopt the statute or would have adopted it with the constitutional interpretation. *United States Chamber of Commerce v. State, supra,* 89 *N.J.* at 152. That decision depends on the purpose, subject, and effect of the statute. *See Schmoll v. Creecy,* 54 *N.J.* 194, 202 (1969) (interpreting intestacy law and wrongful death act definition of "children" to include illegitimate children). It is our duty to save a statute if it is reasonably susceptible to a constitutional interpretation. *State v. Profaci, supra,* 56 *N.J.* at 350. In appropriate cases, therefore, a court may engage in "judicial surgery" to excise a constitutional defect or engraft a needed meaning. *See New Jersey State Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n,* 82 *N.J.* 57, 75 (1980) (limiting election financing reporting act to avoid overbreadth problem); *Collingswood v. Ringgold, supra,* 66 *N.J.* at 357 (limiting an ordinance requiring prior registration of canvassers and solicitors to door-to-door activity on private property); *State v. DeSantis,* 65 *N.J.* 462, 473 (1974) (adding notice and warning requirement to obscenity statute); *Camarco v. City of Orange,* 61 *N.J.* 463, 466 (1972) (limiting broad anti-loitering ordinance to interferences with others in public places or threats of immediate breach of peace); *State v. Profaci, supra; State v. Zito,* 54 *N.J.* 206, 218 (1969) (interpreting statute proscribing failure to give good account of one's self so as to prevent arrest without

opportunity to explain apparently inculpatory circumstances); *Schmoll v. Creecy, supra.*

Before the enactment of *N.J.S.A.* 30:4D–6.1, the Legislature provided funds for all abortions, even those not required to protect the life or health of the mother. One purpose of the statute was to eliminate the use of public funds for abortion "on demand." *See* Statement to S–528 (1975). From this legislative history and the words of the statute, we have no doubt that the Legislature would not want to return to funding elective, non-therapeutic abortions. It is equally clear that the Legislature would want to fund abortions to preserve the life of the mother. Given the high priority accorded to protecting an individual's interest in health and privacy, we believe that the Legislature would prefer that the statute not succumb to its constitutional infirmity but that it survive with coverage extended to medically necessary abortions. From that perspective, we hold that the appropriate construction of *N.J.S.A.* 30:4D–6.1 is that it limits Medicaid funds to those abortions medically necessary to preserve the life or health of the woman. The determination of "medical necessity" is the proper province of physicians, who may be guided, to the extent consistent with competent medical treatment, by the regulations of the Department of Human Services. *See N.J.A.C.* 10:53–1.14(b).

We do not hold directly that the statute was intended to encompass abortions to terminate pregnancies where the mother was the victim of rape or incest. Nonetheless, under those regulations, physicians might well conclude that such abortions are medically necessary.

V

Additionally, plaintiffs claim that *N.J.S.A.* 30:4D–6.1 violates the constitutional provisions guaranteeing freedom of religion, *N.J.Const.* (1947), *Art.* 1, *par.* 3, and proscribing establishment of one religious sect in preference to another. *Id., par.* 4. *Harris v. McRae, supra,* determined the parallel federal constitutional

claims by rejecting the establishment claim and declining, because no plaintiff had standing, to pass on the free exercise issue. 448 *U.S.* at 319–21, 100 *S.Ct.* at 2689–90.

Our rules of standing are more liberal than the federal rules, however, and any slight additional interest is sufficient to afford standing to private individuals to raise issues of great public interest. *Jordan v. Horsemen's Benevolent and Protective Ass'n,* 90 *N.J.* 422, 432 (1982); *Salorio v. Glaser,* 82 *N.J.* 482, 491 (1980). Here, the explicit allegation of a conviction that, under some circumstances, abortion is a religious duty is a sufficient additional interest to warrant consideration of the merits. Therefore, we will address both the establishment and free exercise issues under our Constitution.

 Previously, this Court has concluded that the state Constitution, insofar as its prohibition on the establishment of religion is concerned, is less pervasive than the United States Constitution. *Clayton v. Kervick,* 56 *N.J.* 523, 528 (1970), *vacated on other grounds,* 403 *U.S.* 945, 91 *S.Ct.* 2274, 29 *L.Ed.2d* 854 (1971). Nonetheless, to determine whether a statute violates this prohibition, we have generally followed the federal standard. That standard requires a determination: (1) whether the statute has a secular legislative purpose; (2) whether its primary effect neither advances nor inhibits religion; and (3) whether it fosters excessive governmental entanglement with religion. *Smith v. Ricci,* 89 *N.J.* 514, 523 (1982). *See Committee for Pub. Educ. & Rel. Liberty v. Regan,* 444 *U.S.* 646, 653, 100 *S.Ct.* 840, 846, 63 *L.Ed.2d* 94 (1980). Applying that test to this case, we conclude that the statute does not contravene the constitutional prohibition. First, the statute is related to a secular purpose, the protection of potential human life and the encouragement of childbirth. *See McRae,* 448 *U.S.* at 313, 100 *S.Ct.* at 2686; *Roe v. Wade, supra,* 410 *U.S.* at 162–63, 93 *S.Ct.* at 731–32. Second, the principal effect is not to advance religion. Merely because a statute is consistent with one or more religions does not mean that its principal effect is religious.

*McRae, supra*, 448 *U.S.* at 319–20, 100 *S.Ct.* at 2689–90; *Two Guys from Harrison, Inc. v. Furman*, 32 *N.J.* 199, 215 (1960).

Plaintiffs allege further that the Roman Catholic Church lobbied intensively for the passage of the statute and, therefore, that religion became so entangled in the legislative process that the statute is invalid. The claim, in essence, is that direct or indirect pressure by a religious organization on the legislative process is, without more, a violation of the state Constitution. We disagree.

The facts do not support the broad allegations of excessive influence by a single religious group. Not every anti-abortion lobbyist represented the Roman Catholic Church; not every Catholic legislator voted to restrict abortion funding. In fact, some Catholic legislators voted against the statute.

Even if we were to accept plaintiffs' factual allegations and the questionable view that the state constitutional provision directly proscribes "entanglement," *see Marsa v. Wernik*, 86 *N.J.* 232, 239 n.2 (1981), we perceive no basis for limiting the right of any citizen or group of citizens to seek to persuade elected representatives that a particular viewpoint should be enacted into law. Limiting access to the Legislature on the basis of religion might well violate other fundamental constitutional guarantees, most notably *Art.* I, *par.* 6 ("Every person may freely speak, write and publish his sentiments on all subjects"), and *Art.* I, *par.* 18 ("The people have the right freely . . . to make known their opinions to their representatives"). An organization, even one with a particular religious orientation, has the right to lobby for the passage of legislation. On the record before us, we conclude that neither the Roman Catholic Church nor any other religious organization became so entangled in the legislative process that the statute constitutes the establishment of religion in violation of the Constitution.

 Plaintiffs contend finally that, because some women in some circumstances believe an abortion represents an expression of divine will, the statute infringes on the free exercise of

religion. To the extent the statute prevents those women from obtaining an abortion, plaintiffs argue, it interferes with the free exercise of their religious beliefs. Again, we disagree.

The argument misconstrues the guarantee of the free exercise of religion. *Art.* I, *par.* 3. True, government may not interfere with the free exercise of religion—*e.g.,* by barring clergy from serving as delegates to a state constitutional convention, *McDaniel v. Paty,* 435 *U.S.* 618, 629, 98 *S.Ct.* 1322, 1329, 55 *L.Ed.* 2d 593 (1978); by requiring compulsory school attendance to age 16 in violation of religious tenets, *Wisconsin v. Yoder,* 406 *U.S.* 205, 218–19, 92 *S.Ct.* 1526, 1534–35, 32 *L.Ed.*2d 15 (1972); or by conditioning eligibility for unemployment benefits on willingness to work on the Sabbath. *Sherbert v. Verner,* 374 *U.S.* 398, 403–06, 83 *S.Ct.* 1790, 1793–95, 10 *L.Ed.*2d 965 (1963). It is equally true, however, that the State need not facilitate free exercise. *State v. Fass,* 62 *N.J.Super.* 265 (Cty.Ct.1960), *aff'd,* 36 *N.J.* 102 (1961), *appeal dismissed and cert. denied,* 370 *U.S.* 47, 82 *S.Ct.* 1167, 8 *L.Ed.*2d 398 (1962). The constitutional right to the free exercise of religion is not a promise that following one's faith will be free from cost. All the Constitution assures is that government will not interfere with the exercise of religious freedom.

It may be, as plaintiffs contend, that for some an abortion represents the fulfillment of a religious duty. That duty, however, cannot serve as the basis for requiring public funding, for to compel facilitation of the exercise of that religious duty may well violate the prohibition against the establishment of religion. *See State v. Fass, supra,* 62 *N.J.Super.* at 268. We conclude that the statute does not violate either the prohibition against the establishment of or the guarantee of free exercise of religion.

## VI

After the Chancery Division held that *N.J.S.A.* 30:4D– 6.1 violated both the federal and state Constitutions, plaintiffs moved for reasonable attorneys' fees. The court granted the

motion and awarded plaintiffs counsel fees totaling $19,875. *Right to Choose III*, 173 *N.J.Super.* at 74.

The general rule pertaining to counsel fees is that "sound judicial administration will best be advanced" if litigants bear their own counsel fees except in those situations designated by *R.* 4:42. *See Gerhardt v. Continental Ins. Co.*, 48 *N.J.* 291, 301 (1966). One exception is in cases "where counsel fees are permitted by statute." *R.* 4:42–9(a)(8). Relying on that exception, plaintiffs claim they are entitled to fees as a "prevailing party" in an action to enforce federal civil rights under 42 *U.S.C.A.* § 1988 (section 1988). Thus, the question becomes whether plaintiffs are entitled to reasonable attorneys' fees as "the prevailing party" under the federal statute.

After the decision in *Right to Choose III*, the United States Supreme Court determined that the federal Constitution was not violated by the Hyde Amendment, which restricted Medicaid reimbursement to those abortions necessary for the protection of the life of the mother. *Harris v. McRae, supra.* As previously indicated, we are bound by that determination of federal law. Consequently, plaintiffs have not prevailed on the merits of their federal claims. Thus, no basis exists as a matter of federal law for the award of counsel fees under section 1988.

Plaintiffs argue, however, that they are the prevailing party because they have prevailed on their state law claim, which arises from the same facts as the federal claims. Stated otherwise, plaintiffs contend that, because they have prevailed on a pendent state claim, they are entitled to counsel fees under section 1988. The flaw in that contention is that section 1988 permits an award of counsel fees to a party who prevails on a state claim only when the federal claims are adjudicated favorably for that party or not adjudicated at all. *Kimbrough v. Arkansas Activs. Ass'n*, 574 *F.2d* 423, 426 (8th Cir. 1978). No counsel fees may be allowed where the federal claims have been decided adversely to "the prevailing party." *Luria Bros. & Co. v. Allen*, 672 *F.2d* 347, 357–58 (3d Cir. 1982); *Haywood v. Ball*, 634 *F.2d* 740, 743 (4th Cir. 1980).

Even parties who obtain preliminary or interlocutory relief are not prevailing parties within section 1988 unless they prevail ultimately on the merits of at least some of their federal claims. *Hanrahan v. Hampton,* 446 *U.S.* 754, 758, 100 *S.Ct.* 1987, 1989–90, 64 *L.Ed.*2d 670 (1980); *Bradley v. Richmond School Bd.,* 416 *U.S.* 696, 94 *S.Ct.* 2006, 40 *L.Ed.*2d 476 (1974) (discussing 20 *U.S.C.A.* § 1617); 6 *Moore's Federal Practice* ¶ 54.70[4] at 1309 (2d ed. 1982). While a fee award need not await the resolution of the entire controversy, *Bradley v. Richmond School Bd., supra,* 416 *U.S.* at 722–24, 94 *S.Ct.* at 2021–22, it is clear that "Congress intended to permit the interim award of counsel fees only when a party has prevailed on the merits of at least some of his claims." *Hanrahan v. Hampton, supra,* 446 *U.S.* at 758, 100 *S.Ct.* at 1989. *Compare id.* (denying fees to plaintiff who won reversal of directed verdict) and *Powe v. City of Chicago,* 664 *F.*2d 639, 652 (7th Cir. 1981) (denying fee to plaintiff who won reversal of dismissal for failure to state a claim) *with Maher v. Gagne,* 448 *U.S.* 122, 129–30, 100 *S.Ct.* 2570, 2575, 65 *L.Ed.*2d 653 (1980) (fee permitted when relief obtained by settlement and consent order), and *Iranian Students Ass'n v. Edwards,* 604 *F.*2d 352, 353–54 (5th Cir. 1979) (granting fee to students who obtained temporary restraining order to permit demonstration and consent decree to change rules for future demonstrations).

Under the statute, a preliminary injunction reflects a judgment not on the merits of the claim, but merely a likelihood that the plaintiff will prevail. Plaintiffs who challenge the constitutionality of a statute and obtain interim relief must await a plenary hearing for a determination of their rights to counsel fees. *See Planned Parenthood of Minn. v. Citizens for Community Action,* 558 *F.*2d 861, 870–71 (8th Cir. 1977). Because success on the merits is considered to be a condition precedent to an award of counsel fees, federal courts generally reject applications for counsel fees based on obtaining a preliminary injunction. *E.g., Smith v. University of No. Carolina,* 632 *F.*2d 316, 346–53 (4th Cir. 1980) (fees denied to professor who won prelimi-

nary injunction continuing employment but ultimately lost on merits); *Parks v. Grayton Park Assocs.*, 531 *F.Supp.* 77, 79–80 (E.D.Mich.1982) (fees denied to plaintiffs who won temporary and preliminary injunctions but lost on merits of discrimination claim). *Contra, Deerfield Med. Center v. City of Deerfield Beach,* 661 *F.*2d 328 (5th Cir. 1981) (misquoting *Hanrahan*). Our recent decision in *Westfield Centre Serv. v. Cities Serv. Oil Co.,* 86 *N.J.* 453 (1981), in which we approved a counsel fee for an attorney who obtained a preliminary injunction, is distinguishable because it involved an award of counsel fees predicated not on section 1988, but on the state Franchise Practices Act, *N.J.S.A.* 56:10–1 to 10–15. Furthermore, after the issuance of a preliminary injunction under that Act, the ultimate claim for injunctive relief became moot. Thus, *Westfield* is similar to those federal cases in which the Court never reached the merits of the claim for relief.

Although plaintiffs here succeeded in obtaining a preliminary injunction, permanent relief was ultimately sustained only on the basis of the state, not the federal, Constitution. In brief, plaintiffs did not prevail on the merits of any of their federal claims and, therefore, are not entitled to counsel fees under 42 *U.S.C.A.* § 1988.

## VII

We hold that *N.J.S.A.* 30:4D–6.1 violates equal protection of the laws under the New Jersey Constitution by limiting funds to abortions medically necessary to preserve the mother's life. We construe that statute to require Medicaid funding of all abortions that are medically necessary to preserve the mother's life or health. Plaintiffs' claim for attorneys' fees is denied.

PASHMAN, J., concurring in part and dissenting in part.

I concur in the opinion of the Court insofar as it holds that the State Constitution forbids the State from jeopardizing the health and liberty of poor women by failing to fund medically

necessary abortions. However, I fail to understand why this Court limits its holding to therapeutic abortions. Its reasoning is equally applicable to elective, or non-therapeutic, abortions. Because I accept the Court's reasoning, I believe that the State Constitution requires the State to fund all abortions, including elective abortions, for women who could not otherwise afford them. On that issue I dissent.

## I

The right to choose whether or not to bear a child is partly grounded on the constitutional right to health.[1] *Ante* at 303–304. There is no question that the statute at issue here severely endangers the health of many people in this state. It has the purpose and effect of discouraging abortions, even when pregnancy may result in serious and lasting damage to the mother's health. The majority correctly concludes that the countervailing state interest in potential life cannot justify this immediate infliction of harm on our citizens.

Nonetheless, the majority inexplicably holds that only therapeutic abortions necessary to preserve the mother's health are "medically necessary" and therefore within the scope of the legislative funding of medical services for the poor. It therefore concludes that the Legislature may constitutionally deny funding for elective abortions that are not required for "health" reasons. *Ante* at 312.

---

[1]Unlike the majority, I would affirm Judge Furman's ruling that the right to health is fundamental under the State Constitution. *See ante* at 304. I cannot conclude that the interest in health is accorded merely a "high priority" by our Constitution; it is a fundamental individual right. Indeed, there is no significant difference between the right to health and the right to life itself. May the state actively impair the health of its citizens in the absence of a state interest of overwhelming importance? To ask the question is to answer it. The state may not do anything that jeopardizes the health of our citizens unless its actions are necessary to achieve a compelling state interest.

I disagree. There is no medically valid distinction between therapeutic abortions and so-called elective abortions. When a woman is forced to bear a child against her will, a wide variety of physical and psychological injuries can result. I know of no definition of health which does not take these into account. Further, the pregnancy itself is a medical condition which impairs women in a wide variety of ways; moreover, childbirth always carries a risk to a woman's health or even life. There is no basis for concluding that any abortion performed after consultation with a physician is not medically necessary. This Court has specifically held that there is no medically valid distinction between therapeutic and elective abortions. *See Doe v. Bridgeton Hospital Ass'n, Inc.,* 71 *N.J.* 478, 489 (1976). I see no reason to depart from that position.

The constitutional right to an abortion does not encompass merely the freedom to choose an abortion to protect the mother's health; it includes the freedom to obtain medical help to terminate the pregnancy for any reason. It is now well settled that elective abortions are included in this constitutional guarantee. As Justice Blackmun explained in *Roe v. Wade,* 410 *U.S.* 113, 93 *S.Ct.* 705, 35 *L.Ed.*2d 147 (1973), the constitution protects the freedom of women to choose abortions for a variety of reasons.

Specific and direct harm medically diagnosable even in early pregnancy may be involved. Maternity, or additional offspring, may force upon the woman a distressful life and future. Psychological harm may be imminent. Mental and physical health may be taxed by child care. There is also the distress, for all concerned, associated with the unwanted child, and there is the problem of bringing a child into a family already unable, psychologically and otherwise, to care for it. In other cases, as in this one, the additional stigma of unwed motherhood may be involved. All these are factors the woman and her responsible physician necessarily will consider in consultation. [*Id.* at 153, 93 *S.Ct.* at 727, 35 *L.Ed.*2d at 177]

This Court has also acknowledged the constitutional right to choose an elective abortion. Justice Schreiber wrote in *Doe v. Bridgeton Hospital Ass'n, Inc.,* 71 *N.J.* at 490;

To interpret this act to empower a non-sectarian non-profit hospital to refuse to permit its facilities to be used for *elective abortions* would clearly constitute

state action... The *federal constitutional right* to an abortion during the first trimester is now well-settled... For the state to frustrate that right by its action would be violative of the constitutional guarantee. [citations omitted; emphasis added]

Given that the constitution protects the freedom of individuals to choose elective abortions, I am genuinely perplexed by the majority's conclusion that such abortions are not "medically necessary" services. Pregnant women who do not want to carry the fetus to term will undoubtedly be surprised to learn that an abortion is not a medically necessary procedure. Moreover, this Court has previously held that there is no medically valid distinction that justifies statutory discrimination between elective and therapeutic abortions. In *Doe v. Bridgeton Hospital* we said that:

Neither the trial court nor the defendants have suggested that the regulations [allowing therapeutic abortions and] prohibiting elective abortions were adopted to further any medical standards. Medically there is no valid distinction which justifies permission to utilize hospital facilities and equipment for therapeutic, but not elective abortions. [71 *N.J.* at 489]

There is likewise no medically valid distinction that justifies funding therapeutic but not elective abortions. See *Beal v. Doe,* 432 *U.S.* 438, 453–54, 97 *S.Ct.* 2366, 2375–76, 53 *L.Ed.2d* 464, 477 (1977) (Brennan, J., dissenting) ("there is certainly no affirmative policy justification of the State that aids the Court's construction of necessary medical services as not including medical services rendered in performing elective abortions"). In either case, abortion is a medically necessary procedure; it is the only possible medical procedure for treating the woman's condition of pregnancy in the manner she chooses. Justice Brennan has explained:

Pregnancy is unquestionably a condition requiring medical services... Treatment for the condition may involve medical procedures for its termination, or medical procedures to bring the pregnancy to term, resulting in a live birth. Abortion and childbirth, when stripped of the sensitive moral arguments surrounding the abortion controversy, are simply two alternative medical methods of dealing with pregnancy.... [*Beal v. Doe,* 432 *U.S.* at 449, 97 *S.Ct.* at 2373, 53 *L.Ed.2d* at 475 (Brennan, J., dissenting) (citations omitted)]

A pregnant woman cannot go on living the same kind of life she had before she became pregnant; she is forced to make a

medical decision between two alternative procedures. The failure to choose one of them means that she will inevitably have to undergo the other. It is therefore a mistake to assume that an abortion that is not required for the mother's health is not a medically necessary procedure. Childbirth is not the necessary medical response to pregnancy. It is only one of two alternatives. Abortion is the *only* medical option for a pregnant woman who does not want to give birth.

We must also keep in mind that poor women who are denied funds for abortions may feel compelled to undergo the substantial risk of a self-induced abortion or a cheap illegal abortion by an unqualified person. *Harris v. McRae,* 448 *U.S.* 297, 346, 100 *S.Ct.* 2701, 2710, 65 *L.Ed.*2d 784, 823 (1980) (Marshall, J., dissenting). Justice Marshall has warned that "[i]f funds for an abortion are unavailable, a poor woman may feel that she is forced to obtain an illegal abortion that poses a serious threat to her health and even her life." *Beal v. Doe,* 432 *U.S.* at 458, 97 *S.Ct.* at 2396, 53 *L.Ed.*2d at 480 (Marshall, J., dissenting). This reason alone compels the conclusion that elective abortions are medically necessary services.

I would hold that elective abortions are medically necessary services. The constitutional right to an abortion includes the freedom to choose the desired medical response to pregnancy free from unwarranted government interference. Since the Legislature has provided for medical services for the poor, elective abortions are as much entitled to funding as therapeutic abortions.

II

Even if one could accept the idea that elective abortions are not medically necessary procedures, one must still conclude that the legislative funding of childbirth but not abortion coerces individuals to give up their liberty to exercise a fundamental constitutional right. The majority acknowledges that the constitutional right of privacy includes the liberty to choose be-

tween childbirth and abortion. *Ante* at 303, 306. It tacitly acknowledges, as it must, that this right includes the freedom to terminate a pregnancy for reasons unrelated to the mother's health. For example, the majority notes that individuals have the freedom to choose whether to bear a child who will suffer from a genetic defect. *Ante* at 304. Moreover, the majority admits that by granting funds for childbirth while denying them for abortions, the state impermissibly interferes with that free choice. The majority explains:

> In recent years, moreover, a body of law has developed in New Jersey acknowledging a woman's right to choose whether to carry a pregnancy to full-term or to undergo an abortion... Thus, the statute impinges upon the fundamental right of a woman to control her body and destiny. That right encompasses one of the most intimate decisions in human experience, the choice to terminate a pregnancy or bear a child. This intensely personal decision is one that should be made by a woman in consultation with trusted advisers, such as her doctor, but without undue government interference. In this case, however, the State admittedly seeks to influence the decision between abortion and childbirth. Indeed, it concedes that, for a woman who cannot afford either medical procedure, the statute skews the decision in favor of childbirth at the expense of the mother's health... Statutes such as *N.J.S.A.* 30:4D–6.1 "can be understood only as an attempt to achieve with carrots what the government is forbidden to achieve with sticks." L. Tribe, *American Constitutional Law,* § 15–10 at 933 n.77 (1978). [*Ante* at 303, 306, 308]

If this is so, and I believe it is, then there is no reason whatsoever to limit the government's obligation to funding abortions necessary to protect the mother's health. The argument that the state has chosen to fund only medical services necessary to preserve health is beside the point. The state may not use discriminatory funding to induce poor women to choose childbirth over abortion. As Justice Brennan observed, "[t]his disparity in funding by the State clearly operates to coerce indigent pregnant women to bear children they would not otherwise choose to have..." *Maher v. Roe,* 432 *U.S.* 464, 483, 97 *S.Ct.* 2376, 2387, 53 *L.Ed.*2d 484, 500 (1977) (Brennan, J., dissenting). Indeed, that is its sole purpose. This is impermissible not merely because it endangers the health of our citizens, but because it interferes with the freedom to choose. The majority's conclusion that the state must fund only therapeutic abor-

tions contradicts its own assertions that this statute impermissibly interferes with the protected decision-making process.

The majority refuses to face squarely the fact that the constitutional right to an abortion is broader than the right to protect one's health. The majority consistently presents the issue as if the only individual interest involved is the right of individuals to protect their health. *See, e.g., ante* at 306 ("The funding restriction gives priority to potential life at the expense of maternal health"). Yet it is clear that this is not the only individual interest involved. *Roe v. Wade* established a right to an abortion for any reason. 410 *U.S.* at 153, 93 *S.Ct.* at 726. Once this is clearly acknowledged, it is evident that discriminatory funding of childbirth but not abortion unconstitutionally coerces poor individuals to give up their freedom to terminate the pregnancy.

### III

I would go still further. The freedom to choose whether or not to bear a child is of such fundamental importance that I believe our Constitution affirmatively requires funding for abortions for women [2] who choose them and cannot otherwise afford them. The freedom to act is meaningless if it is not coupled with the ability to effectively enjoy that freedom. This Court has previously recognized that

> a woman possesses a constitutional right to decide whether her fetus should be aborted... Public policy now supports ... the proposition that she not be impermissibly denied a meaningful opportunity to make that decision. [*Berman v. Allan,* 80 *N.J.* 421, 431–32 (1979)]

No "meaningful opportunity" to choose can exist for poor women in the absence of funding. "[F]or women eligible for Medicaid—poor women—denial of a Medicaid-funded abortion is equivalent to denial of legal abortion altogether." *Harris v.*

---

[2] I believe our Constitution also affirmatively requires funding for childbirth to permit effective enjoyment of the fundamental right of procreative choice.

*McRae,* 448 *U.S.* at 338, 100 *S.Ct.* at 2706, 65 *L.Ed.*2d at 818 (1980) (Marshall, J., dissenting).

I agree with the majority that, by funding childbirth but not abortion, the state has interfered with the freedom to choose between them by actively making one alternative more attractive than the other. Yet even if the Legislature chose to fund neither childbirth nor abortion, the impermissible coercion would remain. Poor women who cannot afford abortions simply cannot obtain them in the absence of funding. Such women would be compelled to carry the fetus to term even if the state did not fund childbirth. This is because, as a practical matter, most physicians will not perform abortions unless they are going to be paid. Yet when a woman goes into labor, a hospital does not bar its doors and force her to deliver on the front steps. To this extent, it is irrelevant that the Legislature has chosen to fund childbirth; the failure to fund abortion for the poor in any case is tantamount to an absolute prohibition.

For a doctor who cannot afford to work for nothing, and a woman who cannot afford to pay him, the State's refusal to fund an abortion is as effective an "interdiction" of it as would ever be necessary. [*Singleton v. Wulff,* 428 *U.S.* 106, 118–19 n.7, 96 *S.Ct.* 2868, 2876 n.7, 49 *L.Ed.*2d 826, 836 n.7 (1976)]

The individual interest protected by the constitutional freedom to choose an abortion is of great magnitude. It includes the liberty to control one's body and to determine the "direction of [one's] life." *Beal v. Doe,* 432 *U.S.* at 458–59, 97 *S.Ct.* at 2397, 53 *L.Ed.*2d at 480 (Marshall, J., dissenting). The inability to exercise this fundamental freedom can have grievous consequences. As Justice Marshall noted:

The governmental benefits at issue here, while perhaps not representing large amounts of money for any individual, are nevertheless of absolutely vital importance in the lives of the recipients. The right of every woman to choose whether to bear a child is, as *Roe v. Wade* held, of fundamental importance. An unwanted child may be disruptive and destructive of the life of any woman, but the impact is felt most by those too poor to ameliorate those effects. If funds for an abortion are unavailable, a poor woman may feel that she is forced to obtain an illegal abortion that poses a serious threat to her health and even her life... If she refuses to take this risk, and undergoes the pain and danger of state-financed pregnancy and childbirth, she may well give up all chance of escaping the cycle of poverty. Absent day-care facilities, she will be forced into

full-time child care for years to come; she will be unable to work so that her family can break out of the welfare system or the lowest income brackets. If she already has children, another infant to feed and clothe may well stretch the budget past the breaking point. All chance to control the direction of her own life will have been lost. [*Id.*]

Because the freedom to choose an abortion is so fundamental to one's personhood, it is a liberty that our Constitution affords the highest protection. And it is undisputed that the poor, as well as the rich, are entitled to this constitutional freedom. Yet it is ludicrous to assert that in the absence of funding, poor women who cannot afford abortions have the same freedom to choose between abortion and childbirth as do women who can afford either option. We must not allow the appearance of equal freedom to obscure the reality of its denial. "The strong do what they can," wrote Thucydides, "and the weak suffer what they must." The poor must sometimes act out of necessity rather than free choice. As Anatole France remarked, "the law, in its majestic equality, forbids the rich and poor alike from sleeping under bridges, begging in the streets and stealing bread." Freedom in poverty exists only for saints.

In certain cases, courts have required states to fund the exercise of fundamental constitutional rights and liberties. In *Boddie v. Connecticut,* 401 *U.S.* 371, 91 *S.Ct.* 780, 28 *L.Ed.*2d 113 (1971), the Supreme Court invalidated the requirement of the payment of court fees and costs that restricted the ability of indigents to get a divorce. The Court reasoned that "the right to due process reflects a fundamental value in our American constitutional system." *Id.* at 374, 91 *S.Ct.* at 784, 28 *L.Ed.*2d at 117. The denial of access to the courts effectively denied poor persons the meaningful "opportunity" to obtain a divorce. *Id.* at 380–81, 91 *S.Ct.* at 787–88, 28 *L.Ed.*2d at 120–21. The Court held that a state could not prevent citizens from exercising a fundamental right merely because it resulted in costs to the state. *Id. See also Griffin v. Illinois,* 351 *U.S.* 12, 76 *S.Ct.* 585, 100 *L.Ed.*2d 891 (1956) (holding that indigents must be provided with a free copy of trial transcripts and appellate counsel); *In the Matter of the Guardianship of Felicia Dotson,* 72 *N.J.* 112,

367 *A.2d* 1160 (1976) (free transcript on appeal from a proceeding involuntarily terminating parental rights).

These few cases notwithstanding, it would be disingenuous to deny that this argument is essentially new. While courts have aggressively sought to protect individuals from undue governmental interference in their legal liberties, courts have traditionally shied away from enforcing the right of citizens to effectively enjoy these liberties. The main exception to this practice is the area of procedural due process in which courts have required states to fund constitutional rights to ensure that they can be effectively enjoyed by rich and poor alike.[3]

The argument generally advanced to deny the constitutional right to effective enjoyment of fundamental liberties is that government is not responsible for poverty. *See, e.g., Harris v. McRae,* 448 *U.S.* at 316, 100 *S.Ct.* at 2687–88, 65 *L.Ed.2d* at 804 ("although government may not place obstacles in the path of a woman's exercise of her freedom of choice, it need not remove those not of its own creation. Indigency falls in the latter category"). This distinction must surely not impress the poor person who is told that she has a right but is offered no realistic means to enjoy it. A theoretical right is of no use to a real person. As Justice Blackmun wrote in dissent in *Beal v. Doe:*

> The Court concedes the existence of a constitutional right but denies the realization and enjoyment of that right on the ground that existence and realization are separate and distinct. For the individual woman concerned, indigent and financially helpless ... the result is punitive and tragic. Implicit in the Court's holdings is the condescension that she may go elsewhere for her

---

[3]But *see Schneider v. Irvington,* 308 *U.S.* 147, 60 *S.Ct.* 146, 84 *L.Ed.* 155 (1939), in which the Court held that a town could not constitutionally prohibit citizens from exercising their freedom of speech merely because their distribution of handbills in a public area would result in costs to the town in cleaning up. "Any burden imposed upon the city authorities in cleaning and caring for the streets as an indirect consequence of such distribution results from the constitutional protection of the freedom of speech and press." *Id.* at 162, 60 *S.Ct.* at 151, 84 *L.Ed.* at 165. In effect, the Court held that the municipality had an affirmative constitutional obligation to fund the exercise of the right of free speech under these circumstances.

abortion. I find that disingenuous and alarming, almost reminiscent of: "Let them eat cake." [432 *U.S.* at 462, 97 *S.Ct.* at 2398, 53 *L.Ed.2d* at 483]

Further, it is simply not true that the actions of the state have played no role in creating the poverty in which one-seventh of our citizens are now mired. The state defines and enforces property rights, creates the economic climate in which private enterprise operates, and in myriads of ways effects the economy of the state and the wealth or poverty of its citizens.[4]

The failure to fund abortions for women who cannot afford them effectively deprives them of the freedom to choose. Yet the poor are as much entitled to this constitutional liberty as the rich. To effectively vindicate that right, we have no choice but to hold that the Constitution requires funding.

## IV

The majority notes its disagreement with my conclusion that the New Jersey Constitution affirmatively obligates the state to give poor persons a meaningful opportunity to exercise their freedom to choose whether or not to bear a child. *Ante* at 307 n.5. However, the majority opinion fails entirely to address my other two arguments: first, that elective abortions are in fact medically necessary services, and second, that discriminatory funding of childbirth but not abortion coerces poor women into waiving their constitutional right to terminate the pregnancy.

As to the first argument, I can only repeat the obvious. For a pregnant woman who does not wish to carry the fetus to term, an abortion is a medically necessary service. To hold the opposite is to fly in the face of current medical knowledge and

---

[4]The interrelationship between law and the distribution of income and wealth is a staple of legal literature. *E.g.,* Kennedy and Michelman, "Are Property and Contract Efficient?" 8 *Hofstra L.Rev.* 711 (1980); Cohen, "The Basis of Contract," 46 *Harv.L.Rev.* 553 (1933); Cohen, "Property and Sovereignty," 13 *Cornell L.Q.* 8 (1927); Hale, "Property and Distribution in a Supposedly Non-Coercive State," 38 *Pol.Sci.Q.* 470 (1923); Hale, "Bargaining, Duress, and Economic Liberty," 43 *Colum.L.Rev.* 603 (1943).

practice, and to suggest that although medicine has developed two alternative responses for pregnant women who are rich, government can manage only one option for those who are poor.

As to the second argument, I can only reemphasize that the constitutional right to an abortion includes the freedom to choose an abortion for any reason. The majority correctly recognizes that the interest in potential life *never* outweighs the individual interest in the health of the mother. *Ante* at 306. However, it fails to note that in the first six months of the pregnancy, the individual interest in freedom to terminate the pregnancy *for any reason* outweighs the state interest in potential life. *Roe v. Wade,* 410 *U.S.* at 160, 163, 93 *S.Ct.* at 730, 731, 35 *L.Ed.*2d at 181, 182–83. It is therefore misleading to compare the state interest in potential life to the individual interest in health; this states the countervailing individual interest too narrowly.

If the individual interest protected by the constitution includes the freedom to choose an elective abortion, then state funding of childbirth but not abortion impermissibly coerces poor women to give up that choice. Three dissenters in *Beal v. Doe* argued precisely that. *See* 432 *U.S.* at 454, 97 *S.Ct.* at 2376, 53 *L.Ed.*2d at 477–78 (Brennan, J., dissenting) ("The Court's construction can only result as a practical matter in forcing penniless pregnant women to have children they would not have borne if the State had not weighted the scales to make their choice to have abortions substantially more onerous"); *Id.* at 456, 97 *S.Ct.* at 2395, 53 *L.Ed.*2d at 479 (Marshall, J., dissenting) ("The enactments challenged here brutally coerce poor women to bear children whom society will scorn for every day of their lives"); *Id.* at 462, 97 *S.Ct.* at 2398, 53 *L.Ed.*2d at 483 (Blackmun, J., dissenting).

Moreover, in *Committee to Defend Reproductive Rights v. Myers,* 29 *Cal.*3d 252, 625 *P.*2d 779, 172 *Cal.Rptr.* 866 (1981), the California Supreme Court similarly held that "the asserted state interest in protecting fetal life cannot constitutionally claim

priority over the woman's fundamental right to procreative choice." 625 *P.2d* at 781, 172 *Cal.Rptr.* at 868. "[T]he state is utilizing its resources to ensure that women who are too poor to obtain medical care on their own will exercise their right of procreative choice only in the manner approved by the state." *Id.* at 793, 172 *Cal.Rptr.* at 880. This California case is instructive because the court held that the state had the constitutional obligation to fund elective abortions even though Justice Tobriner rejected the contention that the California Constitution affirmatively required the state to fund the exercise of constitutional rights. *Id.* at 798–99 n.31, 172 *Cal.Rptr.* at 885–86 n.31. Justice Tobriner argued that although the state need not fund medical services in the first instance, once it does, it cannot "withhold funds from some eligible persons because they exercise a constitutional right," *id.,* a right that concededly includes the freedom to choose an elective abortion. *Id.* at 793, 172 *Cal.Rptr.* at 880.

## V

I fully agree with the majority that New Jersey citizens have two independent and complementary sources of fundamental rights and liberties: the federal constitution and the state constitution. However, I disagree with the majority on the extent of that independence. The majority believes it is qualified; I believe it is complete. *See State v. Hunt,* 91 *N.J.* 338 (1982) (Pashman, J., concurring).

Constitutions limit the power of governments to interfere unduly with the liberty and security of individuals. They also, in certain cases, require government to act affirmatively to enable citizens to effectively enjoy fundamental freedoms. The federal constitution, as interpreted by the United States Supreme Court, defines the rights enjoyed by all citizens of the United States. In that sense, no state constitution could validly permit a state government to act in ways prohibited by the federal constitution. However, the federal constitution has never been inter-

preted to limit the power of the citizens of the states to adopt state constitutions that define individual freedoms more broadly than the federal constitution.

The majority correctly notes that both this Court and the United States Supreme Court have held that state constitutions may provide greater protection for individual liberties than does the federal constitution. *Ante* at 290–91. State constitutions do this either by limiting the power of state government more than it is limited by the federal constitution, or by mandating that the state act in ways not required by the federal constitution to enable citizens effectively to exercise fundamental liberties.

Nonetheless, the majority is reluctant to interpret the state constitution's protection of individual liberties more broadly than the federal constitution. It concludes that state constitutions should be interpreted to provide greater protection for individual liberties only where the text differs from the federal counterpart or there exists a "previously established body of state law [that] leads to a different result." *Ante* at 301. In other cases, the majority concludes that the interest in "uniform interpretation of identical constitutional provisions," *ante* at 301, should lead a state supreme court to interpret its state constitution in whatever way the federal constitution has been interpreted by the United States Supreme Court.

I disagree. The benefit of uniform federal constitutional rights is not that all citizens in the country are protected to precisely the same degree: it is that there is a certain minimum of liberty and security that may not be infringed by any state government whether or not it possesses its own constitutional protections. Beyond that minimum, states are free to adopt constitutional charters that protect the citizens of that state even further from oppression by state government.

The definition of state constitutional rights is bound up with federal constitutional rights only to the extent that no state constitution could validly allow state action that would contra-

vene individual liberties guaranteed by the federal constitution. However, the federal constitution *in no way* limits state constitutions from going further. Because this is so, there should be no presumption that the guarantees of the state constitution are identical to those given the federal constitution by the United States Supreme Court. While the interpretation of federal constitutional rights is instructive and helpful in defining state constitutional rights, it is no more than that. The state constitution is completely independent of the federal constitution in this sense.

There may of course be powerful policy reasons for interpreting certain specific state constitutional guarantees to be identical to their federal counterparts. However, there is no basis in constitutional law for *presuming* that the state constitution parallels the federal constitution. The state constitution must be interpreted separately from the federal constitution *unless* there are good reasons of policy to establish a uniform interpretation.

I therefore reject the majority's assertion that state constitutions should be interpreted to provide greater protection for liberty than the federal constitution only where there exists a previously established body of state law to that effect. Why should this matter? That previous body of state law was created by interpretation of the state constitution itself by our state courts. The United States Supreme Court, by defining liberties in a more limited manner, cannot prevent future decisions by state supreme courts that interpret state constitutions to go further. If this were true, the Supreme Court would effectively be the final arbiter, not only of federal constitutional law, but of much state constitutional law. Yet both the Supreme Court and this Court have consistently rejected this position.

I would hold that the New Jersey Constitution provides our state citizens with a fully *independent* source of protection of fundamental rights and liberties. This means that we should

not presume the United States Supreme Court interpretations of the federal constitution dispose of the state constitutional issue. Our state constitution must be interpreted on its own merits, and the liberties it protects are in no way limited by the extent to which they are protected by the federal constitution.

I agree that policy reasons may justify a uniform interpretation of the state and federal constitutions. *See State v. Hunt,* 91 *N.J.* at 338 (Pashman, J., concurring). Nonetheless, this Court remains the final arbiter of the meaning of the state constitution. We cannot relieve ourselves of that obligation by deferring to the decisions of another court. There is simply no court to which we can defer. The citizens of New Jersey have adopted a constitution that ensures their liberties independent of the federal law. The New Jersey Constitution is not an empty gesture. It is the bedrock of liberty in this State. We must uphold it.

O'HERN, J., dissenting.

"To declare a statute unconstitutional is a judicial power to be delicately exercised." *Harvey v. Essex County Board of Free-holders,* 30 *N.J.* 381, 388 (1959). A legislative act should not be declared void unless its repugnancy to the Constitution is clear beyond a reasonable doubt. *Gangemi v. Berry,* 25 *N.J.* 1, 10 (1957). I cannot dispel that reasonable doubt and dissent.

I.

The United States Supreme Court, faced with the precise issue presented here, held that there was no impediment in the United States Constitution to a similar legislative pattern. *Harris v. McRae,* 448 *U.S.* 297, 100 *S.Ct.* 2701, 65 *L.Ed.2d* 784 (1980). That alone should give cause for doubt. This Court concedes that supremacy to interpret the federal Constitution but bases its decision on the equal protection guarantee in the state Constitution. Heretofore we have generally said that the "bur-

den of mounting a successful challenge on equal protection grounds under the state Constitution [under stated circumstances] ... is no different from that which prevails under the federal Constitution." *McKenney v. Byrne,* 82 *N.J.* 304, 317 (1980). We now depart from that principle.

Of course, New Jersey is not bound in interpreting its constitutional guarantees to federal interpretations of comparable provisions. *State v. Hunt,* 91 *N.J.* 338 (1982); *State v. Alston,* 88 *N.J.* 211 (1981); *State v. Schmid,* 84 *N.J.* 535 (1980). Those cases have dealt with specific rights textually guaranteed by the New Jersey Constitution. Here we deal not with a textually guaranteed right, but with a principle of legal analysis.

A concept of equal protection is implicit in Art. I, par. 1 of the New Jersey Constitution, which guarantees the natural and inalienable rights of enjoying life and liberty, of acquiring and possessing property, and of pursuing and obtaining happiness. *Peper v. Princeton Univ. Bd. of Trustees,* 77 *N.J.* 55, 79 (1978). Elaborate analytical structures have been created to guide courts in the application of this seemingly simple concept, giving rise to the observation that we have constructed a "veil of tiers." *Matthews v. Atlantic City,* 84 *N.J.* 153, 175 (1980) (Clifford, J., dissenting). Some commentators have argued that these confusions of equality arise from the concept's concealing the real nature of the substantive rights it incorporates by reference. Westen, "The Empty Idea of Equality," 95 *Harv.L.Rev.* 537, 579 (1982). That is precisely the point that Justice White made in his concurrence in *Harris v. McRae.* He wrote of the dissent there:

> The argument has a certain internal logic, but it is not legally sound. The constitutional right recognized in *Roe v. Wade* was the right to choose to undergo an abortion without coercive interference by the government. As the Court points out, *Roe v. Wade* did not purport to adjudicate a right to have abortions funded by the government, but only to be free from unreasonable official interference with private choice. [448 *U.S.* at 327, 100 *S.Ct.* at 2693, 65 *L.Ed.*2d at 811].

The right at stake here is the right to be let alone in an area involving "the most intimate of human activities and relation-

ships." See *State v. Saunders,* 75 *N.J.* 200, 212 (1980). It is the antithesis of that right to involve other segments of society in that moral choice.

A more fundamental premise should lead the Court to adhere to the United States Supreme Court's view on this deeply divisive issue. When the issue at stake touches upon the national identity, we would be wise to yield to the judgment of the Supreme Court. "[I]n enforcing the federal Constitution . . . the Court is the voice of the more encompassing national community." Gibbons, "Constitutional Adjudication," 56 *N.Y.U.L. Rev.* 260, 275 (1981). The right that this Court supports has been shaped and defined under the federal Constitution. *Roe v. Wade,* 410 *U.S.* 113, 93 *S.Ct.* 705, 35 *L.Ed.2d* 147 (1973). National disunity about an issue so similar in each community cannot be productive in the long view. Though having a surface appeal, the doctrine of independent state grounds would here cause "closing of the avenues to peaceful and democratic conciliation of our social and economic conflicts," a concern that strongly motivated Justice Stewart, the writer of *Harris v. McRae.* Sandalow, "Potter Stewart," 95 *Harv.L.Rev.* 6, 10 (1981).

## II.

On the merits I disagree with the Court's Equal Protection analysis. "Absent infringement of a fundamental right or discrimination against a suspect class, equal protection is not denied if the legislative classification is reasonable and bears a rational relationship to a legitimate governmental objective." *Rubin v. Glaser,* 83 *N.J.* 299, 309 (1980). The majority concedes that we do not deal here with a suspect class. "[P]urposeful discrimination is 'the condition that offends the Constitution,'" *Personnel Administrator of Massachusetts v. Feeney,* 442 *U.S.* 256, at 274, 99 *S.Ct.* 2282 at 2293, 60 *L.Ed.2d* 870 (1979), quoting *Swann v. Charlotte-Mecklenberg Board of Education,* 402 *U.S.* 1, 16, 91 *S.Ct.* 1267, 1276, 28 *L.Ed.2d* 554 (1971), for the "central

purpose of the Equal Protection Clause . . . is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis,* 426 *U.S.* 229, 239, 96 *S.Ct.* 2040, 2047, 48 *L.Ed.*2d 597 (1976). There is no evidence of discriminatory purpose here. The landmark cases in Equal Protection have always focused upon disparate treatment of the individual. *Brown v. Board of Education,* 347 *U.S.* 483, 74 *S.Ct.* 686, 98 *L.Ed.* 873 (1954). (separate education based on color); *Shapiro v. Thompson,* 394 *U.S.* 618, 89 *S.Ct.* 1322, 22 *L.Ed.*2d 600 (1969) (one-year residency requirement for receipt of welfare benefits); *Memorial Hosp. v. Maricopa Cty.,* 415 *U.S.* 250, 94 *S.Ct.* 1076, 39 *L.Ed.*2d 306 (1974) (county medical benefits limited to one-year residents); *Plyler v. Doe,* —— U.S. ——, 102 *S.Ct.* 2382, 72 *L.Ed.*2d 786 (1982) (education denied to aliens).

> The Equal Protection Clause directs that "all persons similarly circumstanced shall be treated alike." *F. S. Royster Guano Co. v. Virginia,* 253 *U.S.* 412, 415 [40 *S.Ct.* 560, 562, 64 *L.Ed.* 989] (1920). But so too, "The Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same. [*Plyler v. Doe,* —— U.S. ——, ——, 102 *S.Ct.* 2382, 2394, 72 *L.Ed.*2d 786 (1982) ].

The subject of the legislation is not the person of the recipient but the nature of the claimed medical service. There is no disguised attempt to single out a class. *Yick Wo v. Hopkins,* 118 *U.S.* 356, 6 *S.Ct.* 1064, 30 *L.Ed.* 220 (1886).

As to infringement of a fundamental right, the essence of the right—to be let alone, has not been infringed. That the Legislature has chosen to subsidize free public education has never been held to infringe upon the constitutional right of parents to send their child to a school of their choice, *Pierce v. Society of Sisters,* 268 *U.S.* 510, 45 *S.Ct.* 571, 69 *L.Ed.* 1070 (1925), or to require government to subsidize the individual's election to attend the chosen school. To translate the limitation on governmental power to interfere in this matter of personal choice into an affirmative funding obligation is an unprecedented result. *Maher v. Roe,* 432 *U.S.* 464, 97 *S.Ct.* 2376, 53 *L.Ed.*2d 484 (1977).

The Court's final task is to deal with the question of whether the classification is reasonable and bears a rational relationship

to a legitimate governmental objective. In the last analysis, the question comes down to whether it is irrational to distinguish between life and health.

I cannot say that such a classification is irrational. To be unable to distinguish these two is to misunderstand one of the central mysteries of existence. Justice Proctor, citing Theocritus, once reminded us that "[f]or the living there is hope, but for the dead there is none." *Gleitman v. Cosgrove,* 49 *N.J.* 22, 30 (1967).[1] Few would seriously doubt the difference.

No particular viewpoint is represented in that conclusion. The members of the Supreme Court who recognized this distinction were not ideologues. Three of those in the *Harris v. McRae* majority had held in *Roe v. Wade* that the liberty protected by the Fourteenth Amendment included a freedom of personal choice in certain matters of family life including the freedom of a woman to decide whether to terminate a pregnancy. But they recognized as legitimate a governmental classification of benefits that recognized an interest in life.

We cannot resolve the imponderable mysteries that divide theologian, scholar and judge. We need only recognize that there is a rational classification here to be made by lawmakers.

### III.

I hold no brief for the view that poor women, especially the minority women making up most of the Medicaid rolls, should not have the same effective moral choice as other women in our society. There is an essential unfairness in such an economic system. But they should have the same choice as well to send their children to private preparatory schools or to own suburban homes that would aid them and their families in breaking through the barriers of neglect. Yet,

---

[1] The cause of action disallowed in *Gleitman* was later allowed in part. *Berman v. Allan,* 80 *N.J.* 421 (1979). The point remains the same.

[in *Robinson v. Cahill*] the Court was justifiably hesitant to ground its holding upon the equal protection clause. As noted in deciding that case, "the equal protection clause may be unmanageable if it is called upon to supply categorical answers to the vast area of human needs, choosing those which must be met and a single basis upon which the State must act. 62 *N.J.* at 492." [*Abrahams v. Civ. Serv. Comm.,* 65 *N.J.* 61, 79 (1974)].

Dealing with the root of the problem is the obvious answer. In the meantime, judges will continue to struggle with such constitutional clauses when relied upon as a source of access to governmental benefits expenditures.

*For affirmance as modified*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER and POLLOCK —5.

*Concurring in part; dissenting in part*—Justice PASHMAN— 1.

*Dissenting*—Justice O'HERN—1.